Revised May 10, 2000

# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

---

No. 98-30267

---

DEBRA W. WOOLEY, individually and as
legal custodian on behalf of the minor Jordan
Adam Taylor Zachary; APRIL ZACHARY,

Plaintiffs-Appellants,

versus

CITY OF BATON ROUGE; THERESA
COULTER; FRED BROOKS; GREG PHARES,
Chief; KEVIN LAPEYROUSE,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Middle District of Louisiana

---

May 8, 2000

Before POLITZ and STEWART, Circuit Judges, and LITTLE,[*] District Judge.

POLITZ, Circuit Judge:

Debra W. Wooley and April Zachary appeal an adverse summary judgment

---

[*]District Judge of the Western District of Louisiana, sitting by designation.

in their action under 42 U.S.C. § 1983. The district court found, *inter alia*, that defendants were entitled to qualified immunity. For the reasons assigned we affirm in part and vacate and remand in part.

## BACKGROUND

In October 1994, April Zachary and her seven-month old son, Jordan, moved in with Wooley. Wooley became Jordan's primary care giver. In December 1994, April sought to transfer custody of Jordan to Wooley by way of an order of the East Baton Rouge Parish Family Court.[1] Wooley testified that April wanted to give her custody of Jordan because "she needed some help raising him, and she did not want her parents ... to get custody of him."

On January 6, 1995, April's parents, Cecil and Sunday Zachary, obtained an order from the Livingston Parish court temporarily transferring to them custody of Jordan.[2] The order did not direct law enforcement officers to effectuate the transfer of custody.

That same day the Zacharys arranged for the Baton Rouge City Police to meet them at Wooley's home. Corporal Theresa Coulter was dispatched there in

---

[1]This order granting custody of Jordan to Wooley was later found to be invalid because the East Baton Rouge Family Court lacked subject matter jurisdiction over the controversy.

[2]This order later was dismissed because the proper venue did not lie in the Livingston Parish court.

response to a reported disturbance but determined that there was no disturbance and left. She was dispatched to the home again, this time requesting and receiving assistance from Sergeant Fred Brooks and Officer Kevin Lapeyrouse. When Coulter reached Wooley's residence the second time, Cecil Zachary was waiting and gave her the Livingston Parish court order. Cecil Zachary told the officers that the court had awarded him custody because April had a history of mental instability and drug use.

The officers discussed the court order before taking any action. Brooks testified that the officers attempted to contact personnel in the juvenile department but that everyone in that office was busy. He further testified that the officers did not attempt to call anyone in the legal department because no one from that division was active at that time of night. He conceded that a legal advisor can be reached after hours under "extreme circumstances, but we have to wait around." Lapeyrouse's testimony supports Brooks, but Coulter testified that neither she nor her fellow officers attempted to contact anyone in either the legal or juvenile departments.

Brooks decided that immediate action had to be taken. Coulter knocked on the door, identified herself as a police officer, and told Wooley to open the door. Wooley complied and the officers stepped inside the residence. In response to a

request by Coulter, Wooley produced her custody papers. Noting the date on her order, the officers informed Wooley that they would have to take Jordan because they had been instructed that when there were conflicting orders, the order bearing the later date prevails. The officers denied Wooley's request to call either her lawyer or April. She pleaded with them not to take the child, claiming that Cecil Zachary had abused April Zachary as a child and that she feared the same thing would happen to Jordan. The officers insisted and Wooley gave Jordan to Coulter. Coulter exited the house and gave Jordan to his grandparents.

Coulter returned to the residence a short time later to obtain additional information from Wooley and spoke by telephone to Wooley's attorney. Due to the apparent prodding of the attorney, a juvenile detective was sent to the residence that night. The detective informed Wooley that he had already contacted Jordan's grandparents and told them that a mistake had been made, but that the Zacharys had refused to return Jordan voluntarily. They did so approximately 90 days later.

As noted, the Livingston Parish court vacated its order, on grounds of improper venue, one week after Coulter seized Jordan. The East Baton Rouge Parish Family Court rendered its custody order null and void for lack of subject matter jurisdiction the next month. The East Baton Rouge Parish Juvenile Court ultimately ordered return of custody of Jordan to April.

4

Wooley, individually and on behalf of Jordan,[3] sued the Baton Rouge City Police Department, the Parish of East Baton Rouge, the City of Baton Rouge, Police Chief Greg Phares, and Officers Coulter, Brooks and Lapeyrouse. In her complaint Wooley claimed that the officers violated her fourth amendment rights against unreasonable searches and seizures and her fourteenth amendment right to family integrity. The complaint also alleged that the police had deprived Jordan of his fourth amendment right against unreasonable seizures and his fourteenth amendment liberty interest in remaining in the custody of his legal guardian. Wooley joined Chief Phares and the City of Baton Rouge, alleging that they acted with deliberate indifference and failed to train the officers adequately. The claims against the Baton Rouge City Police and the Parish of East Baton Rouge were dismissed voluntarily, and the court declined to exercise its jurisdiction over several pendent state law claims. The district court granted the remaining defendants' motion for summary judgment on qualified immunity grounds, and this appeal followed. Appellants do not discuss in their briefs any issue related to the claims against Police Chief Phares and the City of Baton Rouge. Those claims are

---

[3]April Zachary was later substituted as the party bringing claims on Jordan's behalf.

5

deemed abandoned.[4]   We consider only the fourth and fourteenth amendment claims by Debra Wooley and Jordan Zachary.

## ANALYSIS

We review a grant of summary judgment *de novo.*[5]   Summary judgment is proper under Federal Rule of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the nonmoving party is entitled to judgment as a matter of law."[6]   If the movant meets the initial burden of establishing that there is no genuine issue as to a material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.[7]

Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law."[8]   We conduct a bifurcated

---

[4]**Yohey v. Collins**, 985 F.2d 222 (5th Cir. 1993); **Brinkmann v. Dallas County Deputy Sheriff Abner**, 813 F.2d 744 (5th Cir. 1987).

[5]**Duffy v. Leading Edge Products, Inc.**, 44 F.3d 308 (5th Cir. 1995).

[6]**Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).

[7]**Id.**

[8]**Malley v. Briggs,** 475 U.S. 335, 341 (1986).

analysis to determine whether a defendant is entitled to qualified immunity.[9] The first step is to determine whether the plaintiff has alleged a violation of a clearly established constitutional right.[10] A right is "clearly established" if its "contours ... [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."[11] "This is not to say that official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[12] "Further, the applicable law that binds the conduct of officeholders must be clearly established at the very moment that the allegedly actionable conduct was taken."[13] The issue typically is a question of law.[14]

The second step is to determine whether the defendant's conduct was objectively reasonable.[15] "Objective reasonableness is assessed in light of legal

---

[9]**Rankin v. Klevenhagen**, 5 F.3d 103 (5th Cir. 1993).

[10]**Siegert v. Gilley**, 500 U.S. 226 (1991).

[11]**Anderson v. Creighton**, 483 U.S. 635 (1987).

[12]**Id.** (citations omitted).

[13]**Stem v. Ahearn**, 908 F.2d 1, 5 (5th Cir. 1990).

[14]**Pierce v. Smith**, 117 F.3d 866 (5th Cir. 1997).

[15]**Spann v. Rainey**, 987 F.2d 1110 (5th Cir. 1993).

rules clearly established at the time of the incident."[16]  An officer's conduct is not objectively reasonable when "all reasonable officials would have realized the particular challenged conduct violated the constitutional provisions sued on."[17] This issue, too, generally is a question of law, but denial of summary judgment based on a material factual dispute would be appropriate if there are underlying historical facts in dispute that are material to resolution of the question whether the defendants acted in an objectively reasonable manner.[18]

Fourteenth Amendment Claims

Liberty Interest in Relationship Between Wooley and Jordan

Wooley contends that she was deprived of her right to custody of Jordan without due process of law.  In addition, Wooley and Jordan each contend that the police officers violated their fourteenth amendment right to family integrity by removing Jordan from Wooley's  home.  In order to recover under § 1983 for violations of their due process rights, Wooley and Jordan must demonstrate that they were denied a cognizable liberty or property interest clearly established either by state law or the United States Constitution.  We conclude that they did not have

---

[16]**Mangieri v. Clifton**, 29 F.3d 1012 (5th Cir. 1994).

[17]**Pierce**, 117 F.3d 866.

[18]**Mangieri**, 29 F.3d 1012.

such a clearly established interest.

Wooley maintains that she had legal custody of Jordan under Louisiana law as a result of the voluntary transfer of custody from his mother, despite the fact that the order granting custody was rendered by a court that lacked subject matter jurisdiction. Under the law of Louisiana, however, any action taken by a court without proper subject matter jurisdiction is absolutely null and without effect.[19] The East Baton Rouge Parish Family Court therefore was without the power to give custody of Jordan to Wooley, and plaintiffs may not rely on the order granting custody to establish a protected interest under state law.

Wooley asserts in the alternative that April Zachary's failed attempt to transfer custody to her was sufficient to grant her provisional custody by operation of mandate under Louisiana law. La. R. S. 9:951 permits a custodian to authorize another to provide for the care, custody, and control of a minor child for a period of up to one year without the necessity of a court order. A custodian may grant provisional custody by mandate through a public act, a writing under private signature, or even a letter[20] which expressly conveys the transferred powers to the

---

[19]**Bryant v. Pierson**, 583 So.2d 97 (La.App. 1991)

[20]La. Civ. Code art. 2992 (West 1997).

9

mandatary.[21]  To complete the transfer, the mandatary must accept the mandate.[22] Wooley submits that the petition for transfer of custody filed in the East Baton Rouge Parish Family Court, the affidavit of April Zachary, and the affidavit of acceptance by Wooley were sufficient to give Wooley custody over Jordan.

We are not persuaded.  In order to decide whether the district court correctly concluded that the officers were entitled to qualified immunity, we need only determine whether, under Louisiana law, Wooley had a clearly established legal interest in the care, custody, and control of Jordan.[23]  On its face, La. R.S. 9:951 was not available to effect the transfer of custody of Jordan in December of 1994. As it then existed, the statute required the joint participation of both parents in order to transfer custody by mandate, unless the minor's parents were divorced or separated.  The statute made no provision for children born out of wedlock.[24] Pretermitting any question about the validity of the prior statute under both the

---

[21]La. Civ. Code art. 2997 (West 1997).

[22]La. Civ. Code art. 2988 (West 1997).

[23]**Lollar v. Baker**, 1999 WL 1041493 (1999) (Where the existence of a due process claim under § 1983 depends on the existence of rights created by state law, government officials are entitled to qualified immunity unless plaintiff's rights under state law are "clearly established.")

[24]La. R.S. 9:951 (West 1997) was amended in 1995 to include children born out of wedlock.

10

federal and Louisiana constitutions,[25] the reality remains that because only Jordan's mother acted to transfer custody, Wooley's right to provisional custody was not clearly established under Louisiana law at the critical time herein.[26] Thus, neither Wooley nor Jordan were deprived of any clearly established statutory right when the officers removed Jordan from Wooley's home.[27]

We consider next whether the United States Constitution creates a liberty interest that protects the relationship between Wooley and Jordan. That the Constitution protects family relationships and a parent's right to the care, custody, control, and management of their children is well-established.[28] Indeed, the

---

[25]**Mathews v. Lucas**, 427 U.S. 495 (1976); **La. Const. Art**. 1 § 3; **Jordan v. Cosey**, 434 So.2d 386 (1983).

[26]**Saldana v. Garza**, 684 F.2d 1159 (5th Cir. 1982) (holding that law was not clearly established and granting qualified immunity where validity of state statute pursuant to which plaintiff was arrested was questionable on first amendment grounds).

[27]We note two additional bases for this conclusion. First, La. R.S. 9:952 limits the duration of provisional custody by mandate to a period not to exceed one year, but Wooley purported to accept custody of Jordan until he reached the age of eighteen. The effect of an attempt to transfer custody for a period greater than the prescribed period is unclear. Second, La. R.S. 9:953 and Civil Code art. 2998 require that the powers granted to the mandatary be express and specific. Whether the general grant of custody contained in the petition and affidavits relied upon by plaintiffs is sufficient to meet those requirements is similarly unclear. Plaintiffs have cited no precedent that resolves these issues, and our research has failed to produce any that clearly establishes Wooley's rights under Louisiana law.

[28]**Michael H. v. Gerald D.**, 491 U.S. 110 (1988); **Moore v. City of East Cleveland**, 431 U.S. 494 (1977); **Prince v. Massachusetts**, 321 U.S. 158 (1944); **Pierce v. Society of Sisters**, 268 U.S. 510 (1925); **Meyer v. Nebraska**, 262 U.S. 390 (1923); **Morris v. Dearborne**, 181 F.3d 657 (5th Cir. 1999).

11

Supreme Court recognized in **Stanley v. Illinois** that "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ...."[29] We recognized in **Hodorowski v. Ray** the "most essential basic aspect of familial privacy – the right of the family to remain together without the coercive interference of the awesome power of the state."[30] Whether the due process clause protects the relationship between Wooley and Jordan, however, is less clear. Defining the concept of "family" and its place in our society is no elementary task. Although the concept obviously embraces relationships other than those that make up the archetypical nuclear family,[31] our Constitution protects only those social units that share an expectation of continuity justified by the presence of certain basic elements traditionally recognized as characteristic of the family.[32]

That expectation is often justified by a biological link between those asserting the protection. "[T]he usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child

---

[29]**Stanley v. Illinois**, 405 U.S. 645 (1972).

[30]844 F.2d 1210, 1216 (5th Cir. 1988) (quoting **Duchesne v. Sugarman**, 566 F.2d 817 (2nd Cir. 1977)).

[31]**Moore**, 431 U.S. 645.

[32]**Michael H.**, 491 U.S. 110; **Smith v. Organization of Foster Families for Equality and Reform**, 431 U.S. 816 (1977).

have stressed this element."[33]  In **Stanley** the Court, in finding that such a liberty interest existed, emphasized that Stanley "sired and raised" his children and noted that "[i]t is cardinal with us that the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[34]  In **Moore v. City of East Cleveland**, a grandmother challenged an ordinance that forbade certain related family members, including Moore and her grandson, from living in the same home. The Court found a liberty interest based on the recognized tradition of relatives, including uncles, aunts, cousins, and grandparents to "draw together and participate in the duties and satisfactions of a common home."[35]  Further, the Court distinguished **Moore** from **Village of Belle Terre v. Boraas,**[36] in which an ordinance forbidding more than two unrelated persons from living in a single-family house was found to be constitutional, because the ordinance challenged in **Boraas** specifically permitted individuals related by "blood, adoption, or marriage" to live together.  In short, the biological relationship between Moore and her

---

[33]**Id.**

[34]**Stanley** at 1212-13 (quoting **Prince**, 321 U.S. 158)

[35]**Moore**, 431U.S. at 505.

[36]416 U.S. 1 (1974).

13

grandson brought the case within the ambit of the fourteenth amendment.

The existence of a family, however, does not depend entirely on biological relationships. Quite to the contrary, the foundation of the traditional family is built upon the marriage relationship between persons who are not blood related. The right to privacy within a marriage has occupied considerable significance in the Court's fourteenth amendment jurisprudence:

> We deal with a right of privacy older than the Bill of Rights, older than our political parties, older than our school system. Marriage is a coming together for better or worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony of living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.[37]

Thus, the Court has recognized that familial expectations might arise not only through biological relationships, but also through the "intimacy of daily association" and the resulting emotional attachments.[38] The Court in **Smith** acknowledged the possibility that a relationship similar to a parent-child relationship might exist between an unrelated adult and child, and implied that some such relationships might enjoy due process guarantees even if not sanctioned

---

[37]**Griswold v. Connecticut**, 381 U.S. 479, 486 (1965); see also **Loving v. Virginia**, 388 U.S. 1 (1967).

[38]**Smith,** 431 U.S. 816.

14

by state law. **Smith** stopped short of identifying the foster parent-child relationship as one such relationship, however, because the foster parents' expectations of an enduring companionship were not justified in view of the state law under which the emotional ties originated and the natural parents' recognized liberty interest derived from their blood relationship with their children.[39]

There is no dispute about the emotional bonds that developed between Wooley and Jordan during the period that Wooley was Jordan's primary care giver. Wooley was present at Jordan's birth. In addition to her love and affection, Wooley provided Jordan with a home, food, clothing, medical insurance, and other care ordinarily provided by parents to their children. She agreed to accept these responsibilities until Jordan reached his eighteenth birthday, and has continued to fulfill them.[40] An intimate, loving relationship by itself, however, is not sufficient to create a familial expectation that our society and Constitution are prepared to recognize. In this regard, the present case is similar to **Franks v. Smith**.[41] In **Franks**, Pam Strong left her daughter Misty in the care of the Franks. Two and

---

[39]**See also Drummond v. Fulton County Dept. of Family & Children's Services**, 563 F.2d 1200 (5th Cir. 1977) (finding no liberty interest in foster parent-child relationship that existed for more than two years).

[40]Wooley stated in her deposition that she cares for Jordan Monday through Friday or Saturday each week and that April, who now has legal custody, cares for him on the weekends.

[41]721 F.2d 153 (5th Cir. 1983).

15

one-half years later she sought to regain custody of Misty. Local law enforcement officers went to the Franks' home and, without a warrant, seized Misty and returned her to Pam Strong. The Franks sued the Oktibbeha County Sheriff and Welfare Department, alleging that their fourteenth amendment rights had been violated. We first considered whether the Franks had a legal interest in Misty under Mississippi law. Concluding they did not, we then examined whether the Franks had a liberty interest in "maintaining their social unit of which Misty was a member."[42] We concluded the ties between the Franks and Misty "were emotional only, and, while important, simply are not sufficient to create a legal interest against Misty's biological parent."[43]

The present case is distinguishable from the prior cases in which the right to family integrity has been asserted by persons not biologically related on two obvious and important bases. Unlike the cases involving foster families, the contours of the relationship between Wooley and Jordan are not defined by state law, and state law does not supply the justifiable expectations that attend their relationship.[44] In addition, unlike in **Frank**, the expectation that the relationship

---

[42]**Id.** at 154.

[43]**Id.** at 155.

[44]**Smith**, 431 U.S. 816; **Drummond**, 563 F.2d 1200.

would be a durable one has not been defeated by the child's biological parents. In fact, April Zachary's approval of their relationship has created and fostered those expectations. Wooley and Jordan contend that under the rubrics of the foregoing cases the emotional ties between a minor and an unrelated adult care giver can create a liberty interest *vis-a-vis* the child's biological grandparents when the relationship is countenanced by the child's natural mother. They thus contend that under the circumstances here presented Wooley and Jordan shared a fourteenth amendment protected expectation that the state would not interfere in their relationship. However persuasive this contention ultimately may be, we need not definitively resolve it here, for it is indisputable that, at the time of the events in question, no such fourteenth amendment right could be described as *clearly established*. As to this claim, therefore, Wooley has failed **Siegert's** "first inquiry" in that she has "failed to allege the violation of a *clearly established* constitutional right."[45] The district court did not err in granting the defendants qualified immunity on this claim."

Jordan's Liberty Interest in Remaining in the Care of April Zachary

We are not hesitant, however, in finding constitutional protection for the

---

[45]500 U.S. at 231. Cf. **Hunter v. Bryant**, 502 U.S. 224 (1991); **Pierce**, 117 F.3d at 872.

17

relationship between Jordan and his natural mother. April Zachary does not assert any

claims on her own behalf but, rather, asserts a claim on behalf of Jordan. Because a

child's right to family integrity is concomitant to that of a parent,[46] we define the scope

of Jordan's rights in this context with reference to his mother's rights.

A biological relationship traditionally has given rise to familial expectations that

are "venerable and [] deserving of constitutional protection."[47]

> The intangible fibers that connect parent and child have infinite variety.
> They are woven throughout the fabric of our society, providing it with
> strength, beauty and flexibility. It is self-evident that they are sufficiently
> vital to merit constitutional protection in appropriate cases.[48]

Although a biological relationship does not conclusively establish a liberty interest, the

cases in which that interest has been found lacking have concluded that those familial

expectations were defeated by either the biological parent's disassociation from the

child[49] or the state's and society's traditional preference for and protection of other

inconsistent family models.[50] Here we have neither circumstance. April Zachary has

---

[46]**Duchesne,** 566 F.2d at 825; **Bennet v. Town of Riverhead,** 940 F.Supp. 481, 488-89 (E.D.N.Y. 1996) ("This interest is reciprocal in that it belongs to the children as much as it does to parents).

[47]**Moore,** 431 U.S. at 504.

[48]**Lehr v. Robertson**, 463 U.S. 248, 256 (1983).

[49]**Lehr**, 463 U.S. 248; **Quillion v. Walcott**, 434 U.S. 246 (1978).

[50]**Michael H.,** 491 U.S. 110.

18

maintained a significant role in Jordan's life. At the time of the alleged occurrences, she and Jordan lived in the same home and maintained daily contact. If she moved out, she and Wooley had agreed that she was to visit Jordan every weekend and for several hours during the week. When a biological parent "'com[es] forward to participate in the rearing of [her] child,' [her] interest in personal contact with [her] child acquires substantial protection under the due process clause."[51] April never removed herself from Jordan's life to a degree sufficient to support the conclusion that she no longer has a liberty interest in personal contact with him. It cannot be seriously suggested that the traditions of our nation establish a preference for child rearing antithetical to the manner in which April proposed to raise Jordan such that her expectation of maintaining a relationship with her son might be unjustified.

Jordan undeniably is entitled to stay with his mother without governmental interference. That requires us to consider the nature of the process due Jordan before depriving him of that right. The right to family integrity must be balanced against the state's interest in protecting the health, safety, and welfare of children.[52] In close cases, the tension between these two interests is pronounced and we occasionally have been

---

[51]**Lehr**, 463 U.S. at 261 (citing **Caban v. Mohammed,** 441 U.S. 380, 392 (1979). This protection is not lost when the parent assumes a role other than primary care giver. **Smith,** 431 U.S. 816.

[52]**Prince**, 321 U.S. 158, 166 ("the family itself is not beyond regulation in the public interest"); **Morris**, 181 F.3d 657 (5th Cir. 1999).

unable to conclude that the due process violation involved was "clearly established."[53]

Defendants claim that this is such a case and that they are entitled to qualified immunity because they acted to protect Jordan and to defuse a potentially explosive situation. We are not persuaded. Our cases in which the state's interest has blurred the existence of a family's rights uniformly have involved removal of children by social workers specifically charged with protecting children where there were allegations of abuse.[54] There is no indication in this record of any threat to Jordan's safety, nor were the officers investigating allegations that he previously had suffered abuse at the hands of Wooley or April. The requirements of due process may also be satisfied where police officers are authorized to effect a transfer of custody in furtherance of the state's prerogative to protect the welfare of children.[55] As mentioned previously, however, the

---

[53]**Id.** We note that **Morris**, which was decided in 1999, is relevant to this case despite the fact that our consideration is limited to the clearly established law as it existed in 1995. **Morris** involved a claim of qualified immunity for events that occurred in 1992. Our consideration therein focused on the law clearly established in 1992.

[54]**Kiser v. Garret,** 67 F.3d 1166 (5th Cir. 1995); **Doe v. Louisiana,** 2 F.3d 1412 (5th Cir. 1993); **Hodorowski v. Ray**.

[55]**Hurlman v. Rice,** 927 F.2d 74 (2nd Cir. 1991); **Bennett v. Town of Riverhead,** 940 F.Supp. 481 (1996). **Bennett** bears a striking resemblance to this case. Christy and William Bennett were divorced by a judgment that entitled Christy to sole custody of their daughter Charlotte and granted William visitation including three weeks each year away from his custodial residence. When Christy sought the court's permission to change her residence to Arizona, William made known his intention to exercise his three weeks of visitation beginning August 1, but failed to challenge the modification of the visitation decree. The decree was modified. Nevertheless, on August 1 he enlisted the assistance of a police officer in obtaining custody of Charlotte. The officer went to Christy's home in order to control what the police viewed as a "potentially hostile domestic relations dispute" and,

court order obtained by the Zacharys did not direct the police to take any action. Under the circumstances, April and Jordan Zachary enjoyed a clearly established right to maintain their relationship free from interference by state actors.

## Fourth Amendment Claims

Plaintiffs also claim that the officers violated their clearly established fourth amendment rights. Wooley alleges that her fourth amendment rights were violated when the officers engaged in a warrantless, non-consensual search of her home and a warrantless seizure of her person. Jordan contends that the warrantless seizure of his person was likewise a violation of his constitutional rights. Although Wooley's claims were properly before the district court, the trial judge failed to consider them. Under similar circumstances, we have remanded to the district court rather than proceed on the merits without the benefit of prior district court consideration.[56] We opt to do so in this instance, remanding same, and now address the fourth amendment claims of Jordan. That amendment provides:

---

after reading both the original order granting visitation to William and the modified order allowing her and Charlotte to move to Arizona, expressed his opinion that William's order controlled and allegedly ordered Christy to relinquish Charlotte. The district court concluded that the officer was not entitled to qualified immunity because the plaintiffs had alleged a clearly established denial of due process.

[56]**Smith v. Alumax Extrusions**, 868 F.2d 1469 (5th Cir. 1989); **Logan v. Hollier**, 711 F.2d 690 (5th Cir. 1983).

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[57]

It has long been clearly established that there is a constitutional right to be free from unreasonable seizures.[58] Further, identical fourth amendment standards apply in both the criminal and civil contexts.[59] In assessing the reasonableness of a search or seizure, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[60] The appropriate balance between an individual's interest in remaining free from seizure of his person and the government's interest in enforcing its laws has been reached by requiring a warrant or the existence of probable cause that the individual has committed some criminal act.[61]

The defendants concede that they had neither a warrant nor probable cause to

---

[57]**U.S. Const. amend. IV**.

[58]**Brower v. County of Inyo**, 489 U.S. 593 (1989); **Steagald v. United States**, 451 U.S. 204 (1981).

[59]**Soldal v. Cook**, 506 U.S. 56 (1992).

[60]**United States v. Place**, 462 U.S. 696, 703 (1983); **Tennessee v. Garner**, 471 U.S. 1 (1985); **New Jersey v. T.L.O.**, 469 U.S. 325 (1985).

[61]**United States v. Robinson,**414 U.S. 218 (1973); **Atwater v. City of Lago Vista**, 195 F.3d 242 (5th Cir. 1999) (en banc).

seize Jordan.  In order to prevail, therefore, they must demonstrate a governmental interest sufficient to justify dispensing with constitutional protections.  The record before us is devoid of such.  As previously noted, there was no evidence of danger to Jordan sufficient to implicate the state's interest in protecting the health, safety, and welfare of minors.  The officers further contend that they acted to defuse a potentially explosive situation. Even if this assertion were true, the interest created by this circumstance is no greater than the interest of law enforcement generally to enforce the laws and keep the peace.  The seizure of Jordan in order to quell a potentially volatile situation was no more permissible than the seizure of Debra Wooley or Cecil Zachary would have been under the same circumstances.

## Objective Reasonableness

Finally, the officers contend that it was objectively reasonable for them to seize Jordan because: (1) they defused a potentially explosive situation, (2) Cecil Zachary indicated that Jordan was in danger,[62] and (3) the Livingston Parish court order was valid on its face.  As discussed previously, however, the desire to avoid a domestic

---

[62]Appellees also insist that they were authorized to take Jordan into custody under La. Ch. Code arts. 621 and 736.  Both provisions allow peace officers to take children into custody without a warrant when there is an immediate threat to their welfare.  Neither provision allows for the release of a child taken into custody to anyone other than his parents or the proper authorities.  Because there is no evidence of an imminent threat to Jordan's welfare, however, neither of these provisions apply to the officers' actions.

dispute cannot form a reasonable basis for depriving Jordan of his fourth and fourteenth amendment rights. Reasonableness in this context must be gauged in light of clearly established law. An exception for the preservation of domestic tranquility cannot reasonably be thought to exist as to the right to family integrity or the right to be free from unreasonable seizures. The officers' actions, even if they perfectly served this goal, were not reasonably within the bounds of the law. Nor was it objectively reasonable for the officers to believe that Jordan was in danger of imminent harm. The Livingston Parish order in no way indicated that Jordan's safety might be jeopardized. The police were not informed of any abuse prior to arriving at Wooley's home, and they found no evidence of abuse while there. Although Cecil Zachary made allegations casting doubt on April Zachary's fitness as a mother, he made no statement that tended to indicate Jordan was unsafe in Wooley's home. In fact, April Zachary was not present while the police were deciding what to do, and by all appearances Jordan appeared to be safely in Wooley's care.

Finally, it was not objectively reasonable for the officers to rely on the Livingston Parish court order. The officers could not reasonably have viewed the order as one granting them authority to effect the transfer of custody of Jordan Zachary in light of the Louisiana statute which requires a civil warrant under such circumstances:

Upon presentation of a certified copy of a custody and visitation rights

order rendered by a court of this state, together with the sworn affidavit of the custodial parent, the judge, who shall have jurisdiction for the limited purpose of effectuating the remedy provided by this Section by virtue of either the presence of the child or litigation pending before the court, may issue a civil warrant directed to law enforcement authorities to return the child to the custodial parent pending further order of the court having jurisdiction over the matter.[63]

The proper and appropriate action by the police officers in an instance as is here presented, and that which on the state of the record as presently constituted appears to have been the procedure followed by the Baton Rouge officers, is pointedly expressed in a letter directive issued a few days after the subject incident. That letter, the issuance of which warrants our recognition and plaudits, states:

> The police department is not to be involved in enforcing child custody orders in the absence of a specific order signed by a judge and directed to law enforcement to pick up a certain child and deliver him/her to a certain place. General orders stating that one parent is to have custody of the child from Friday - Sunday, for example, are not to be enforced by this Department. The orders that police officers are to enforce must be an order to law enforcement officers directing officers to pick up and deliver a child. "Civil warrants" are an example of these direct orders to law enforcement, and are enforceable throughout the state just as other warrants are. However, if you are relying simply on a court order that is not a warrant, it must be signed by a judge of this parish. These will be relatively rare, as most judges will choose to style their own orders to law enforcement in the form of a warrant. Whether you are relying on a civil warrant or simply a court order, you must have it in your possession before you take any action. In addition, both civil warrants and court

---

[63]La. R.S. 9:343.

orders, to be enforceable, must be stamped by the Clerk of the Court with the words "Certified True Copy." The stamp must be an original. If those three magic words do not appear on the order, DO NOT ENFORCE THE ORDER (emphasis in original).

The order presented by Cecil Zachary did not direct law enforcement officers to pick up Jordan and deliver him to a place certain, was not signed by a judge in East Baton Rouge Parish, and was not stamped with the words "Certified True Copy." The proper course of action would have been for the officers to wait for the issuance of a civil warrant by an East Baton Rouge Parish judge. At the very least, they should have refrained from acting until they received guidance from their legal or juvenile departments. Without specific authorization or the aforementioned guidance, and in light of express state law, it was not objectively reasonable for the officers to have viewed the Livingston Parish court order as empowering them to seize Jordan and to act as they allegedly did.

The judgment of the district court is therefore AFFIRMED in part, and VACATED and REMANDED in part, for further proceedings consistent herewith.