**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-31317

_____

CHERIE SHIPP, JERRY GATES,

Plaintiffs-Appellees,

versus

ROYCE L. MCMAHON, Sheriff of Webster Parish, Louisiana
STEVE CROPPER, Webster Parish Sheriff's Office Deputy
BETTY SHIPP, Webster Parish Sheriff's Office Deputy
THEODORE L. RISER, Sheriff of Webster Parish Louisiana,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Louisiana, Shreveport Division

_____

December 5, 2000

ON PETITION FOR REHEARING

(Opinion January 1, 2000, 5th Cir., 2000, ____F.3d____)

Before POLITZ and STEWART, Circuit Judges, and LITTLE[*], District Judge.

CARL E. STEWART, Circuit Judge:

The petition for panel rehearing is GRANTED. The opinion, 199 F.3d 256 (5th Cir. 2000),

is VACATED, and the following opinion is substituted:

_____

[*] District Judge of the Western District of Louisiana, sitting by designation.

This case involves the defendants-appellants' challenge to the district court's denial of their motion to dismiss the plaintiffs-appellees' claims brought under 42 U.S.C. § 1983 (1994) and state tort law. The defendants-appellants moved to dismiss the plaintiffs-appellees' claims under Fed.R.Civ.Proc. 12(b)(6) claiming qualified immunity. The district court denied the defendants-appellants' motion. For the reasons stated below, we REVERSE the district court's ruling.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Plaintiff-appellee Cherie Shipp ("Shipp") was involved in an abusive marriage with her husband, Dalton Shipp ("Dalton") in Shreveport, Louisiana. To escape her husband's abuse, Shipp moved into her sister's home near Minden, Louisiana. When Dalton learned of Shipp's whereabouts, he made several threatening phone calls to her, which she reported to deputies of the Webster Parish Sheriff's Office ("WPSO"). On several occasions, Dalton also drove by the home of Shipp's sister. Shipp reported these "drive-bys" to defendant-appellant Steve Cropper ("Cropper"), a Webster Parish deputy. Cropper informed Shipp that he would do nothing about Dalton.

Shipp then moved to her cousin's residence in Dubberly, which is also in Webster Parish. Dalton went to the house in Dubberly, attacked Shipp by beating her with a telephone that he ripped from the wall, and hit her with his fist. He forewarned Shipp that if she reported the incident to law enforcement, she would "find herself in the hospital." After physically abusing her, Dalton took some items belonging to Shipp and her cousin, placed them in his automobile, and drove off. Despite Dalton's admonition, Shipp called the WPSO. Deputy Cropper came to the scene and took a report, but made no immediate effort to arrest Dalton.

Several days later, Deputy Cropper approached Dalton about returning the items that he took from the residence of Shipp's cousin, but did not arrest him. Afterward, Dalton was allowed to turn

2

himself in, and he was charged with simple criminal damage to property and simple battery, both misdemeanor offenses. As a condition of bail, the court ordered that Dalton stay away from Shipp. Dalton pleaded guilty to both offenses, and the court ordered him to seek immediate counseling. The court set sentencing for a later date.

Shipp obtained a temporary restraining order ("TRO") that prohibited Dalton from having any contact with her. After Deputy Cropper served Dalton with the TRO, Dalton made several abusive and threatening phone calls to Shipp, which Shipp reported to the WPSO. She was told that nothing could be done about the phone calls, and despite his violations of the TRO and the bail order, the WPSO did not arrest Dalton.

Dalton failed to appear in court for sentencing on the criminal charges, and a bench warrant for his arrest was issued. Although Dalton eventually appeared in court to answer other unrelated criminal charges at the Webster Parish courthouse, deputies nonetheless failed to arrest him for violating the TRO and conditions of bail.

Approximately four months after Dalton failed to appear at the scheduled sentencing hearing for the offenses committed against Shipp, Dalton tracked down Shipp at her other sister's house and convinced Shipp to come out of the house and get into his car. Once in the car, Dalton sped away with Shipp's feet dragging the ground. She attempted to jump out of the car, but Dalton grabbed her by the head and drove Shipp to a house that he had leased in Webster Parish.

Shipp's sister telephoned her mother, Carolyn Gates, who reported the incident to the WPSO. Defendant-appellant Betty Shipp, Dalton's mother, was the dispatcher who received the phone call. Apparently, she hung up the telephone without conducting an inquiry into the particulars of the incident before advising Deputy Cropper of the call. He chose to take no action, despite his

3

knowledge of Dalton's propensity for violent behavior. Neither Cropper nor Betty Shipp dispatched information to alert the other deputies.

After Betty Shipp terminated the phone call, Shipp's mother called the Minden Police Department, which dispatched an emergency alert and radioed the WPSO. Shipp's mother then picked up Jerry Gates, Shipp's father, and drove to the Webster Parish courthouse. They observed Deputy Cropper standing idly outside the courthouse. Cropper advised Mr. Gates that he intended to do nothing to apprehend Dalton. After they discussed where Dalton may be located with Shipp, Mr. Gates denounced Cropper's unwillingness to act, and told him that he was heading to Dalton's leased house. Deputy Cropper and another deputy pursued Mr. Gates.

Subsequently, Mr. Gates and four deputies arrived at the house. When the deputies made no effort to enter the house, Mr. Gates attempted to approach the house, but was restrained by the deputies. Cropper then knocked on the door, explaining that he had to ascertain whether Shipp was voluntarily in the house with Dalton. No one inside answered Cropper's knock.

At Dalton's house, Mr. Gates observed what he believed to be a silhouette on a curtain showing a person with a gun. Mr. Gates again attempted to approach the house, but the deputies ordered him back. A shot rang out from the house and the deputies immediately retreated to their vehicles to put on armored vests. Another shot rang out as the deputies remained crouched behind their cars.

Inside the house, Dalton had raped Shipp. After shooting her in the chest with a 12-gauge shotgun, he shot himself. Shipp staggered to the door and unsuccessfully attempted to open it. She screamed for help, but none of the deputies responded. Shipp eventually staggered out a side door holding her entrails in her hands.

4

As she exited the house, Shipp's mother and a deputy raced to her aid. Mr. Gates also dashed toward Shipp, but Cropper abruptly intercepted him. At Cropper's order, another deputy handcuffed Mr. Gates and removed him from the scene.

Shipp was transported to a hospital, where she underwent emergency surgery. She was hospitalized for several weeks, followed by rehabilitation, therapy, and more surgery. Dalton recovered from his wounds and was subsequently charged with aggravated rape, aggravated kidnapping, and attempted second degree murder. Following the incident, the WPSO took no disciplinary action against any deputy.

In February 1997, Shipp and Mr. Gates filed an action under 42 U.S.C. § 1983 in federal district court against Sheriffs Royce McMahon and Theodore Riser,[1] and WPSO deputies Shipp and Cropper ("defendants"). Shipp and Mr. Gates claimed that the defendants violated their federal constitutional due process and Equal Protection rights. Shipp and Gates also alleged claims based on Louisiana state tort law. The defendants moved to dismiss under FED R.CIV.P. 12(b)(6). In January 1998, the magistrate judge filed a report recommending that: (1) all of Shipp's federal constitutional claims, with the exception of the Equal Protection claim and the related failure to train claim, be dismissed with prejudice; (2) all federal claims by plaintiff Jerry Gates be dismissed with prejudice, and (3) all claims against Sheriff Theodore L. Riser be dismissed with prejudice, and (4) the motion be denied in all other aspects. The district court adopted the magistrate judge's findings and recommendation. The district court also exercised supplemental jurisdiction over the state tort law claims and ordered Shipp to file a reply to the assertion of qualified immunity by deputies Cropper and Shipp. After reviewing Shipp's reply to the qualified immunity issue, the district court

---

[1] Sheriff Riser succeeded Sheriff McMahon after the rape and shooting incident.

5

found that Shipp had met the pleading requirements articulated in <u>Schultea v. Wood</u>, 47 F.3d 1427 (5th Cir. 1995) (en banc), and denied the defendants' motion to dismiss. The defendants now appeal the district court's ruling denying their motion to dismiss based on qualified immunity.

<u>STANDARD OF REVIEW</u>

Denials of motions to dismiss on qualified immunity grounds are appealable collateral orders when based on issues of law. <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 525, 105 S.Ct. 2806, 86 L. Ed. 2d 411 (1985); <u>Champagne v. Jefferson Parish Sheriff's Office</u>, 188 F.3d 312 (5th Cir. 1999)(per curiam). We review the district court's ruling under Rule12(b)(6) <u>de novo</u>. <u>Lowrey v. Texas A & M University System</u>, 117 F.3d 242, 246 (5th Cir. 1997). A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." <u>Kaiser Aluminum & Chem. Sales v. Avondale Shipyards</u>, 677 F.2d 1045, 1050 (5th Cir.1982). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. <u>Campbell v. Wells Fargo Bank</u>, 781 F.2d 440, 442 (5th Cir.1986). The district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957). This strict standard of review under Rule 12(b)(6) has been summarized as follows: "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2nd ed.1990).

<u>DISCUSSION</u>

6

The defendants argue that they are entitled to qualified immunity because Shipp failed to plead that the defendants violated clearly established law. In other words, the defendants maintain that when the alleged improper conduct occurred, there existed no clearly established law recognizing an Equal Protection claim based on law enforcement policies, practices, and customs toward domestic abuse cases.

Qualified Immunity

The qualified immunity analysis involves a two-step process. First, we examine whether the plaintiff has alleged a violation of a clearly established constitutional right. See Siegert v. Gilley, 500 U.S. 226, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991); Wooley v. City of Baton Rouge, 211 F.3d 913, 919 (5th Cir. 2000). If the court determines that the plaintiff has alleged a violation of a clearly established constitutional right, the next step is to determine whether the official's conduct was objectively reasonable at the time of the incident. Sanchez v. Swyden, 139 F.3d 464, 467 (5th Cir. 1998); Mangieri v. Clifton, 29 F.3d 1012 (5th Cir. 1994). Thus, if the pleadings on their face show an unreasonable violation of a clearly establish constitutional right, the defense of qualified immunity will not sustain a motion to dismiss under Rule 12(b)(6).

Clearly Established Right

When evaluating a claim of qualified immunity under the "clearly established right" prong, a court first must determine whether the "'plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 119 S. Ct. 1292, 1295, 143 L. Ed. 2d 399 (1999)). Thus, we begin our inquiry by addressing domestic assault and Equal Protection.

7

The first cases testing the viability of an Equal Protection claim relating to law enforcement policies, customs, and practices toward domestic abuse cases were filed in the mid-1970s. However, those cases were ultimately settled before trial.[2] The first reported case holding that a law enforcement policy that treated victims of domestic abuse differently than victims of non-domestic assault constituted an Equal Protection violation was decided in 1984. See Thurman v. City of Torrington, 595 F. Supp. 1521, 1531. (D. Conn. 1984) ( denying the police officers' motion to dismiss and declaring that the plaintiff's allegation that the officers intentionally afforded victims of domestic assault less protection than victims of other assault was sufficient to state an Equal Protection claim).

In 1989, the Supreme Court decided Deshaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). Although the main issue in Deshaney involved the plaintiff's substantive due process claim regarding the defendant's failure to remove timely the plaintiff, a minor-child, from his abusive father's custody,[3] the Court in footnote three provided pivotal language that has formed the foundation for contemporary Equal Protection challenges to law enforcement policies, practices, and customs toward domestic abuse. The Court stated that, "[t]he State may not of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." Id. at 189 n.3. (citation omitted).

---

[2] See Gender Based Discrimination in Police Reluctance to Respond to Domestic Assault Complaints, 75 GEO. L.J. 667, 677 (1986).

[3] The Court ultimately held that the state did not have a constitutional duty under substantive due process to protect the plaintiff from his abusive father after receiving reports of possible abuse. Deshaney, 489 U.S. at191.

The same year <u>Deshaney</u> was decided, we addressed for the first time whether a plaintiff's claim based on police inaction, and law enforcement policies and customs that allegedly treated victims of domestic assault differently from victims of other crimes violate the Equal Protection Clause as contemplated by the Supreme Court in <u>Deshaney</u>'s footnote three. In <u>McKee v. City of Rockwell</u>, 877 F.2d 409 (5th Cir. 1989), we affirmed a district court's grant of summary judgment asserting that the plaintiff failed to produce sufficient summary judgment evidence to show that the defendants adopted law enforcement policies, customs, and practices that treated victims of domestic assault differently from victims of other crimes. <u>McKee</u>, 877 F.2d at 416. As such, the court left open the questions of whether law enforcement policies, practices, and customs that treat victims of domestic assault differently from victims of other crimes constitute intentional discrimination against women under <u>Washington v. Davis</u>, 426 U.S. 299, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976), and whether such policies discriminate against protected minorities within the meaning of <u>Deshaney</u>'s footnote three. <u>McKee</u>, 877 F.2d at 416.

Approximately eleven years after <u>McKee</u>, we are again called upon to address whether a domestic abuse victim's complaint against a law enforcement agency and its officials for failure to effectuate an arrest, and for their adoption of policies, practices, and customs that discriminate against victims of domestic assault constitute intentional discrimination against women, and thus is cognizable under the Equal Protection Clause. Specifically, Shipp claims that the defendants through their policies, practices, and customs afforded less protection to victims of domestic assault than other assault victims. Furthermore, Shipp claims that these policies, customs, and practices disproportionately impact women because an overwhelming majority of the victims of domestic

9

assaults are women. The issues raised in Shipp's complaint invoke the unresolved questions of McKee.

Before addressing McKee's unresolved questions, we recognize that governmental policies, which create neutral classifications that have a disproportionate adverse impact upon a protected class, are unconstitutional under the Equal Protection Clause only if the disproportionate impact can be traced to a discriminatory purpose. Personnel Admin. of Mass. v. Feeney, 442 U.S. 256, 272, 99 S. Ct. 2282, 2292, 60 L. Ed. 2d 870 (1979). Thus, the Equal Protection clause of the Fourteenth Amendment prohibits a state from engaging in intentionally discriminatory conduct that has an adverse disparate impact on women unless the state can show an "exceedingly persuasive justification for that action." See United States v. Virginia, 518 U.S. 515, 530, 116 S. Ct. 2264, 2274, 135 L. Ed. 2d 735 (1996). State policies that perpetuate antiquated and outdated gender stereotypes that are derogatory and condescending toward women do not form the basis for proper discriminatory purpose. See Mississippi University for Women v. Hogan, 458 U.S. 718, 102 S. Ct. 331, 73 L. Ed. 2d 1090 (1982).

In addressing the questions McKee left open, we observe that courts from other circuits have addressed similar Equal Protection challenges based on law enforcement policies, practices, and customs that treat victims of domestic assault differently from other crime victims. In Watson v. City of Kansas City, 857 F.2d 690 (10th Cir. 1988), a victim of domestic assault brought a § 1983 action against a city, the city's police department, and several police officers acting in their official capacities for adopting policies, practices, and customs that provided less protection to domestic assault victims than other assault victims. In addressing the victim's claim, the Watson court articulated a legal standard that domestic assault victims must meet to sustain an Equal Protection challenge. The

10

Watson court declared that to maintain an Equal Protection claim, the plaintiff must show: (1) that a policy or custom was adopted by the defendants to provide less protection to victims of domestic assault than to other assault victims; (2) that discrimination against women was the motivating factor for the defendants: (3) and that the injury was caused by the operation of the policy or custom. See Watson 857 F.2d at 694.

Several other circuits have adopted the standard articulated in Watson to review Equal Protection claims brought by victims of domestic assault. See Soto v. Fores, 103 F.3d 1056, 1066 (1st Cir. 1997) (stating that,"[u]nder the standard we adopt today, Soto must show that there is a policy or custom of providing less protection to victims of domestic assault than to other victims, that gender discrimination is a motivating factor, and that Soto was injured by the practice"); Ricketts v. City of Columbia, 36 F.3d 775, 779 (8th Cir. 1994) (applying the Watson standard to an Equal Protection claim against a municipality); Eagleston v. Guido, 41 F.3d 865, 878 (2d Cir. 1994) (applying the Watson standard); Hynson v. City of Chester, 864 F.2d 1026, 1031 (3rd Cir. 1988) (announcing that,"[w]e agree with the Watson court that if the categories used by the police in administering the law are domestic assault and nondomestic assault, this is not sufficient to raise a claim for gender-based discrimination absent a showing of an intent, purpose or effect of discriminating against women").[4]

We agree with our sister circuits that the standard articulated in Watson represents a coherent approach for courts to review Equal Protection claims pertaining to law enforcement's practices,

---

[4] Although the Ninth Circuit has not specifically adopted Watson, the court in Balistreri v. Pacifica Police Dept, 901 F.2d 696, 701 (9th Cir. 1990), has recognized that an animus against abused women coupled with law enforcement's differential treatment of domestic assault cases may support a gender-based Equal Protection claim.

11

policies, and customs toward domestic assault cases. First, the standard allows law enforcement

officials the flexibility and discretion to adopt and employ policies that are tailored to address the

special concerns that domestic assault cases raise without compromising the protective services that

law enforcement provides.[5] Law enforcement "discretion is essential to the criminal justice process."

McCleskey v. Kemp, 481 U.S. 279, 297, 107 S. Ct. 1756, 1769, 95 L. Ed. 2d 262 (1972).

Furthermore, law enforcement officials will be liable only for those policies, practices, customs, and

conduct that are the product of invidious discrimination. While statistical evidence showing

disproportional impact is probative on the issue of gender-based motivation, such evidence without

a showing of intent is insufficient to sustain an Equal Protection claim. See Washington v. Davis, 426

U.S. 229, 239, 96 S. Ct. 2040, 2047, 48 L. Ed. 2d 597 (1976). Finally, the causation requirement

will hold law enforcement officials accountable only for injuries that result from inaction or conduct

pursuant to invidious policies, customs, and practices. As such, law enforcement would not be held

liable for generalized harms that are not traceable to their conduct, policies, or customs.

Furthermore, law enforcement would not be called to answer for those injuries that are solely

attributable to the perpetrators of the underlying domestic assault.

Therefore, today we join the circuits that have adopted Watson's approach, and hold that to

sustain a gender-based Equal Protection claim based on law enforcement policies, practices, and

customs toward domestic assault and abuse cases, a plaintiff must show: (1) the existence of a policy,

practice, or custom of law enforcement to provide less protection to victims of domestic assault than

---

[5] Because domestic assault cases usually involve parties in volatile intimate or familial relationships, we acknowledge that special law enforcement tactics may be employed in these instances that may be impracticable in other assault cases. As one court noted, " there are inherent differences between domestic disputes and nondomestic disputes, . . . that may affect an officer's decision to arrest or not to arrest in any given situation." Ricketts, 36 F.3d at 781.

12

to victims of other assaults; (2) that discrimination against women was a motivating factor; and (3) that the plaintiff was injured by the policy, custom, or practice.  By adopting this approach to answer the pretermitted question in McKee, we accomplish one of the principal goals of qualified immunity, which is to provide objective standards  so that "an official [can] be expected to know that certain conduct  [] violate[s] statutory or constitutional rights."  Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S. Ct. 2727, 2378-79, 73 L. Ed. 2d 396 (1982).

We turn now to consider Shipp's claim.  In order to defeat the defendants' assertion of qualified immunity, Shipp must show that the criteria above were clearly established at the time of the alleged improper conduct that formed the basis of her complaint.

To show that a right is clearly established, the plaintiff does not have to refer to  precedent that is directly on point, or that declares that the conduct in question is unlawful.   Rather, the right is clearly established if based on pre-existing law, the unlawfulness of the conduct in question is apparent.  Doe v. Independent School Dist., 15 F.3d 443, 455 (5th Cir 1994)(en banc), cert. denied, 506 U.S. 1087, 113 S.Ct. 1066, 122 L. Ed. 2d 371 (1994).  In other words, the right is clearly established if its "contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 438 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).  Additionally, we conduct a "snapshot" inquiry by canvassing the legal rules that were clearly established at the time of the official's alleged improper conduct.  See Anderson, 438 U.S. at 639.  Furthermore, in determining whether a right is clearly established, we are confined to precedent from our circuit or the Supreme Court.  Boddie v. City of Columbus, 989 F.2d 745, 748 (5th Cir. 1993).

To date, the only other case in our circuit that has spoken on this Equal Protection issue is McKee. Since our holding in McKee, there has been no intervening precedent from this circuit or the Supreme Court addressing an Equal Protection claim based on law enforcement policies, practices, and customs toward victims of domestic assaults. Although McKee was decided a year after Watson, McKee contains no language rejecting or approving the standard articulated in Watson.

Thus, we recognize that the delicately counterpoised competing considerations undergirding the doctrine of qualified immunity and their resulting jurisprudence are instructive in the case at bar. Persons whose federal rights have been violated by government officials' abuse of their positions should have a means of vindication that includes pursuing monetary compensation. But government officials should be uninhibited by the chilling specter of civil litigation and personal liability to exercise the discretion requisite to perform their duties so long as the officials' conduct does not violate clearly established law. See Owen v. City of Independence, 445 U.S. 622, 651, 100 S. Ct. 1398, 63 L. Ed. 2d (1980); Anderson, 483 U.S. at 638; Harlow v. Fitzgerald, 457 U.S. at 814. Based upon this tenuous balance, courts have narrowly adjudicated issues of qualified immunity largely to the benefit of government officials. See Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct 1092, 89 L. Ed. 2d 271 (1986) (stating that qualified immunity will protect "all but the plainly incompetent or those who knowingly violate the law"); Johnson v. Fankell, 520 U.S. 911, 117 S. Ct. 1800, 138 L. Ed. 2d 108 (1997); Jones v. City of Jackson, 203 F.3d 875, 883 (5th Cir. 2000) (stating "[q]ualified immunity is a shield from civil liability for 'all but the plainly incompetent or those who knowingly violate the law'") (quoting Malley, 475 U.S. at 341); Mendenhall v. Riser, 213 F.3d. 226 (5th Cir. 2000). Accordingly, we hold that the defendants are entitled to qualified immunity because the standard we pronounced above was not clearly established by the Supreme Court nor our circuit prior to our

14

opinion today.  See Wilson, 526 U.S. at 614-618 (granting qualified immunity because media ride-alongs during the execution of a search warrant were not a clearly established violation of the Fourth Amendment, despite the Court having declared such conduct violates the Fourth Amendment).

Class of One Equal Protection Claims

Notwithstanding the defendants being entitled to qualified immunity against Shipp's gender-based Equal Protection complaint regarding the policies, customs, and practices of the WPSO toward domestic violence victims, recent Supreme Court precedent suggests that an alternative Equal Protection claim may be available to Shipp.  In Village of Willowbrook v. Olech, 528 U.S.562, 120 S. Ct. 1073, 1074-75, 145 L. Ed. 2d 1060 (2000), the Court held that the Equal Protection Clause can give rise to a cause of action on behalf of a "class of one" even when the plaintiff does not allege membership in a protected class or group.  To state a claim sufficient for relief, a single plaintiff must allege that an illegitimate animus or ill-will motivated her intentionally different treatment from others similarly situated and that no rational basis existed for such treatment.  Id.

Although no general constitutional right to police protection exists, the state may not discriminate in providing such protection.  McKee, 877 F.2d at 418 (Goldberg, J., dissenting in part and concurring in part).  Applying the rationale of Olech, the Seventh Circuit addressed the consequences of unequal police protection under the Equal Protection Clause.[6]  The court reasoned that in the unusual setting of "class one" equal protection cases alleging unequal police protection, demonstrating that the unequal police protection had no rational basis requires a plaintiff to "present

_____

   [6] This court has yet to confront an Equal Protection challenge in the context of a class of one claim.  See Bryan v. City of Madison, 213 F.3d 267, 277 n.18 (5th Cir. 2000) (stating "[w]e have never specifically addressed whether such a motive would be enough to support an equal protection claim without some other class-based discrimination, but that issue is not before us").

15

evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000). Moreover, the court reasoned that such an improper motive is critical and opined that its absence will defeat an Equal Protection challenge to unequal police protection. Id.

According to the complaint, Betty Shipp was intimately involved in the situation that precipitated the case at bar. Not only is she Dalton's mother but she was also a deputy in the WPSO during the time he stalked, threatened, and harassed Shipp as well as when Dalton pled guilty to charges of criminal damage to property and simple battery as a result of his attacking Shipp and taking her belongings. Betty Shipp was still a WPSO deputy when the aforementioned behavior prompted the court to issue a temporary restraining order against Dalton prohibiting harassment or abuse of or contact with Shipp as well as when the court issued a bench warrant for Dalton's arrest following his subsequent failure to appear.

Moreover, the pleadings further allege that Betty Shipp actually received the call of Carolyn Gates, Shipp's mother, alerting the WPSO that Dalton had kidnapped Shipp, warning them that the situation was volatile, and beseeching the officers to intervene. Betty Shipp responded by hanging up on Carolyn Gates, and although she advised Cropper of the call, neither deputy dispatched a radio transmission to inform other deputies of Carolyn Gates' complaint. Consequently, after he malevolently kidnapped Shipp, Dalton brutally raped and viciously shot her in the chest with a 12-gauge shotgun.

It is undisputed that Betty Shipp's son engaged in reprehensible behavior against her daughter-in-law that finally resulted in law enforcement and judicial intervention. It is not

16

improbable that Betty Shipp developed some animosity against her daughter-in-law during her volatile relationship with Dalton or after Shipp fled when Dalton's escalated abuse prompted criminal charges against him. If deputy Betty Shipp did foster ill-will against her daughter-in-law that ultimately influenced the level of protection Shipp received from the WPSO, Shipp may be able to establish an unequal police protection claim within the framework elucidated in Village of Willowbrook v. Olech. As such, the district court should allow Shipp to amend her complaint accordingly.

CONCLUSION

We REVERSE the district court's denial of the defendants' motion to dismiss under FED.R.CIV.PROC. 12(b)(6), and hold that the defendants are entitled to qualified immunity. We REMAND to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

17