IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

No. 18-20157

———————

United States Court of Appeals
Fifth Circuit

**FILED**
August 29, 2019

Lyle W. Cayce
Clerk

CHRISTINA ROMERO; GARY ADAN CRUZ, SR.

> Plaintiffs - Appellant

v.

AMANDA BROWN; NICOLE MOUTON; ROLAND BENAVIDES; ROBERT
RUIZ; CITY OF HOUSTON; DOES ONE THROUGH TEN

> Defendants - Appellees

————————————

Appeal from the United States District Court
for the Southern District of Texas

————————————

Before KING, HIGGINSON, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Christina Romero and Gary Adan Cruz are the parents of seven children. The Texas Department of Family and Protective Services received information that Cruz was abusing Romero. It ordered Cruz to move away from the apartment where Romero and their children lived. He complied. More than a month later, a social worker and other officials seized all seven children from Romero and put them in foster care homes. The seizures occurred in the middle of the day without a court order. The next day a state court judge found no justification for the removal and ordered the immediate return of the children to both parents.

No. 18-20157

The parents allege violations of their due process rights.  We conclude that the complaint does not allege a violation of clearly established substantive due process rights because there was an ongoing investigation into domestic violence and the removal lasted only 24 hours.  But the removal did violate clearly established procedural due process rights because there was neither a court order nor exigent circumstances to support the social worker's taking the children from their mother.

I.

A.

The following is what Plaintiffs say happened.  At the pleading stage, we only have their side of the story and must accept it as true.  *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015).

Romero lived with Cruz and their seven children in a small apartment in Houston.  The first allegation that Cruz engaged in domestic violence against Romero came in 2014.  Then, in fall 2015, their six-year-old daughter told her school counselor that Cruz punched and "body slammed" Romero. Family and Protective Services opened an investigation and sent an investigator to the apartment.  The parents allege that the investigator could "easily verify" the allegations were untrue, and the investigator did not contact any law enforcement officials at that time.  But early the next year, the agency ordered Cruz to move out of the apartment and enroll in parenting, domestic violence, and anger management classes.  Cruz continued to contest the allegations but complied with the agency's requests.

Shortly after the investigator's visit, the case was transferred to social worker Amanda Brown.  In March 2016, Brown conducted another home visit to Romero's apartment, apparently at the direction of her supervisor, Nicole Mouton.  From the start, Brown spoke "disparagingly" of Romero's financial condition and told Romero she needed to make more money.  Romero tried to

No. 18-20157

explain that Cruz's moving out worsened the family's money troubles. Brown replied, "That's not my problem. That's more your problem," and suggested Cruz may never be allowed to return. She also criticized Romero for sometimes having her 15-year-old son babysit the younger children instead of sending them to daycare. Romero explained that she worried about the quality of daycare and that she could not afford it. Brown "sneered" at Romero, said Family and Protective Services could help cover childcare costs, and "appeared upset" that Romero questioned her recommendations.

Brown spent the remainder of the home visit sitting at the kitchen table using her cellphone. This prompted Romero to say to her, "You are not doing your job. You are just sitting here playing on your phone." Romero told Brown she wanted to file a complaint with Brown's supervisor about that behavior. Brown "became visibly enraged, and abruptly terminated the visit." Romero heard nothing from Brown the remainder of the day.

The next morning, around 11:00, Brown and two policer officers, Roland Benavides and Robert Ruiz, surrounded Romero's vehicle in the parking lot of the apartment complex. Romero was returning to her apartment with her one-month old baby and two toddlers. Brown and the officers seized all three children. They did not have a court order. Brown threatened Romero with arrest unless she signed a Notice of Removal.

About an hour later, a Family and Protective Services employee seized Romero's other four children at school. There was no court order to take these children either. All seven children were placed in foster care homes and spent the night away from their mother.

The following day, a state court hearing was held to determine if the warrantless removal was justified. *See* TEX. FAMILY CODE §§ 262.104, 106 (2017) (requiring such a hearing for a removal without court order). The judge found no evidence of physical abuse, malnourishment, or medical neglect. The

No. 18-20157

judge rebuked Brown for "remov[ing the] children without a Court Order in the middle of the day" even though there was enough time to obtain a court order. The court ordered the children returned home and allowed Cruz to return home as well. The children were reunited with their parents that day.

B.

The parents filed suit alleging that Brown, Mouton, the police officers, and the City of Houston violated their Fourteenth Amendment due process rights. All defendants moved for dismissal, which the district court granted. The court held that a violation of the right to family integrity was not clearly established in the context of a social worker investigation, entitling both Brown and Mouton to qualified immunity. And it found no authority to support the claim against the police officers. The court also dismissed all claims against the city for failure to sufficiently allege municipal liability under section 1983.

II.

We review a dismissal on the pleadings de novo. *In re ATP Oil & Gas Corp.*, 888 F.3d 122, 125–26 (5th Cir. 2018) (quotation omitted). Allegations against defendants who enjoy qualified immunity must overcome that protection, which "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity at the pleading stage raises two questions. First, does the complaint allege a constitutional violation? If so, was the violation clearly established so that the government official would have known she was violating the law? *Turner v. Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017). Because the complaint focuses on social worker Brown, we will first address whether Plaintiffs have alleged that she violated the parents' clearly established due process rights.

4

No. 18-20157

A.

"The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (cleaned up). Indeed, a parents' right to "care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)*; see also Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 400–01 (1923).

Because a parent's custody and control of her children is a fundamental liberty interest, the government may violate substantive due process when it takes away that right. *See Moore v. City of East Cleveland*, 431 U.S. 494, 498–500, 503 (1977); *Troxel*, 530 U.S. at 65, 72–73; *Morris v. Dearborne*, 181 F.3d 657, 665 (5th Cir. 1999). Yet as strong as the "right of the family to remain together without the coercive interference of the awesome power of the state" is, the state also has a strong interest in preventing child abuse. *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988) (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)). So in a substantive due process analysis, "[t]he right to family integrity must be balanced against the state's interests in protecting the health, safety, and welfare of children." *Wooley v. Baton Rouge*, 211 F.3d 913, 924 (5th Cir. 2000).

A balancing test is difficult terrain for a party having to prove a clear violation of the law. *Id.* at 671; *see also Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988) (recognizing the "unsuitability of such a general right [to family integrity] to fix liability in particularized circumstances"). We analyze whether a claim alleges a clearly established violation of the right to familial association by "placing [the claim], on a case by case basis, along a continuum between the state's clear interest in protecting children and a family's clear

interest in privacy." *Morris*, 181 F.3d at 671. If the facts of the case "place it in the center of the continuum," meaning the state's and family's interests overlap, the right to family integrity is considered too "nebulous" to find a clearly established violation. *Id.* If, on the other hand, the case is "squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court," qualified immunity is not a defense. *Id.*

Defeating immunity for a family integrity claim thus "hinges, in large part, upon the degree of fit between the facts of this case" and our prior opinions. *Id.*; *see also Hodorowski*, 844 F.2d at 1217 (recognizing the "unsuitability of such a general right [to family integrity] to fix liability in particularized circumstances"). That fit is lacking here. Two features of this case are absent from any of our child removal cases finding a substantive due process violation: a pending investigation into domestic violence and a removal lasting only one day.

Because the substantive due process inquiry becomes a clash of two vital interests when the state removes a child as part of a domestic violence investigation, it is not surprising that we have never found a clearly established violation of the right to family integrity in that context. In fact, we have never found such a violation in any case against a child welfare worker. *See, e.g.*, *Kiser v. Garrett*, 67 F.3d 1166, 1173 (5th Cir. 1995); *Hodorowski*, 844 F.2d at 1217 (both rejecting liability for social workers involved in the temporary removal of children when there was an ongoing investigation); *Hall v. Dixon*, No. H-09-2611, 2010 WL 3909515 (S.D. Tex. Sept. 30, 2010) (Rosenthal, J.) (observing that the Fifth Circuit "has found violations of clearly established law only when state employees who are not social workers have acted to separate children from their families without evidence of harm to the child"). In finding violations of clearly established law when a teacher or police

officer played a role in the removal of a child, we distinguished their relatively smaller role in "ferret[ing] out possible instances of abuse" from that of child welfare officials for whom that is the paramount concern. *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999) (denying qualified immunity to teacher who reported alleged abuse); *see also Wooley*, 211 F.3d at 924 (denying qualified immunity to police officers who removed a child without a court order).

To be sure, the interest in preventing child abuse was attenuated in this case despite the pending investigation. No one had alleged that Cruz had assaulted the children, and he was no longer residing in the apartment. *See Wooley*, 211 F.3d at 924 (noting that "cases in which the state's interest has blurred the existence of a family's rights uniformly have involved removal of children by social workers . . . where there were allegations of abuse"). That means the state's interest was much less than it was in cases with allegations of ongoing abuse of children. Still, the state's interest in protecting Romero's children was not eliminated. The child's allegation against Cruz relayed extremely violent conduct. Spousal abuse is an indicator of child abuse. *See* CHILD ABUSE & NEGLECT: RISK AND PROTECTIVE FACTORS, CTR. FOR DISEASE CONTROL & PREVENTION (listing "intimate partner violence" as a risk factor for child abuse and neglect). So the open investigation into domestic violence factors into the substantive due process balancing.

One other aspect of this case confirms that it ends up in the nebulous zone of the substantive due process continuum. Foundational family integrity cases "involved the state's attempt to sever *permanently* the parent-child relationship." *Hodorowoski*, 844 F.2d at 1217 (emphasis in original) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982); *Stanley v. Illinois*, 405 U.S. 645 (1972)). Cases since have found clear violations of substantive due process only when the removal measured in months or years. *See Wooley*, 211 F.3d at 918 (finding violation when mother lost custody of her child for approximately

three months); *Morris*, 181 F.3d at 671 (finding violation when child was placed in foster care for three years and cut off from all contact with her father during that time)  Although the state's taking children for any amount of time is a serious encroachment on a parent's fundamental right, the one-day removal of Romero's children is a much less substantial interference with the right to control a child's upbringing than these far lengthier removals.  *See Hodorowski*, 844 F.2d at 1217 (finding that the "temporary" nature of a removal was "alone [] sufficient to prevent us from concluding that appellants' conduct violated clearly established law").  Combine that with the role of a child welfare officer who had a pending investigation into domestic violence, and there is not a similar case finding substantive due process liability.  As a result, qualified immunity protects Brown from the substantive due process claim.

## B.

The Due Process Clause does not just provide parents with substantive protection from interference with their liberty interest in the care, custody, and management of their children.  It also requires that the state follow certain procedures before encroaching on those parental rights.  *Santosky v. Kramer*; 455 U.S. 745, 753–54 (1982); *Stanley v. Illinois*, 405 U.S. 645, 658 (1972); *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).  And importantly for the qualified immunity analysis, unlike the fuzzy continuum that governs substantive due process in this area, there are bright lines when it comes to the procedural safeguards.

The rule is this: A child cannot be removed "without a court order or exigent circumstances."  *Gates*, 537 F.3d at 434.  This is the same standard that governs a child's Fourth Amendment claim for being removed from the family.  *Id.* at 345.  *Gates* followed other circuits that had "equated the procedures required under the Fourteenth Amendment with those required

under the Fourth Amendment for searches and seizures related to child abuse investigations." *Id*. at 435 (citing *Doe v. Kearney*, 329 F.3d 1286 (11th Cir. 2003); *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000); *Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999)).  With *Gates* on the books, we later held that a procedural due process claim overcame qualified immunity at the summary judgment stage because evidence would allow a jury to find that children were seized without court approval or an emergency.  *Wernecke v. Garcia*, 591 F.3d 386, 391 n.7 (5th Cir. 2009).[1]  It is thus clearly established that a court order or exigency is the predeprivation process that is due when social workers remove a child.[2]  *Gates*, 537 F.3d at 434; *Wernecke*, 591 F.3d at 391 n.7.

The complaint alleges that neither a court order nor exigent circumstances existed when Brown seized Plaintiffs' seven children.  It is undisputed that Brown did not obtain a court order.  Nor was there reason to believe that the children were "in imminent danger of physical or sexual abuse" if they were not immediately removed.  *Gates*, 537 F.3d at 429.  Cruz had been accused only of spousal abuse, had left the apartment weeks earlier, and there were no reports that he had attempted to return.  Indeed, Defendants do not even try to argue that there was an emergency related to the children's safety.

---

[1] Brown contends that *Wernecke*'s decision not to "conduct a separate analysis of the Werneckes' Fourteenth Amendment claims" means that it was rejecting the possibility of the parents' procedural due process claim.  That ignores what the court did: It remanded to allow the due process claim, just like the children's Fourth Amendment claim, to continue past the summary judgment stage.  591 F.3d at 391 n.7.  There was no need to conduct a separate due process analysis because under *Gates* the standard was the same as that governing the Fourth Amendment claim.  *Id*.

[2] When an exigency is the basis for the removal, a prompt postdeprivation hearing is required.  *Gates*, 537 F.3d at 435 (finding no due process violation because exigent circumstances supported the removal of the children and a hearing was held the day after the seizure); *Martin v. Tex. Dep't of Protective & Regulatory Servs.*, 405 F. Supp. 2d 775, 790 (S.D. Tex. 2005) (finding no procedural due process violation because the child was removed based on allegations of sexual abuse and parents received a hearing within 24 hours).

No. 18-20157

They instead suggest that "the distressing state of Plaintiffs' home" created such an urgency that the children needed to be removed before a court order could be obtained. But we have previously rejected the notion that a "merely cluttered" home poses an imminent danger to children justifying a warrantless removal. *Wernecke*, 591 F.3d at 400–01. And Plaintiffs have more than just their own version of events to rely on. The ruling of the state judge, finding no exigency to justify the removal and immediately returning the children to both parents, lends further support to a procedural due process claim under the clearly established *Gates* standard.

Defendants' primary pushback on the procedural due process claim is to argue that when there is a claim grounded in a specific constitutional provision like the Fourth Amendment, the Due Process Clause should not offer separate protection from the same conduct. *See Albright v. Oliver*, 510 U.S. 266 (1994). But *Albright* refers to explicit textual sources of constitutional protection displacing "the more generalized notion of '*substantive* due process.'"[3] *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *cf. Morris*, 181 F.3d at 676 (Jolly, J., concurring) (arguing that, under *Graham*, "an analysis under the procedural due process doctrine should preempt our consideration of the plaintiffs' claim under the doctrine of substantive due process"). Here the apparent overlap is between the Fourth Amendment and procedural due process. The larger point, however, is that there is no overlap. The ones who are seized, the children, may assert a Fourth Amendment claim (brought on

---

[3] This principle shows why another of Brown's suggestions—that child removal claims are only governed by substantive due process and not procedural due process—gets things backwards. As Judge Higginson's concurring opinion points out, if anything procedural due process should be the primary source of protection. Concur. Op. (citing *Morris*, 181 F.3d at 676 (Jolly, J., concurring)). We nonetheless also address substantive due process because the parties pressed that analysis and our cases have applied both substantive and procedural due process analysis to child removal cases.

their behalf by the parents). *Gates*, 537 F.3d at 427. The parents who lose control of their children may assert a due process right. *Id*. at 434. As a result, in child removal cases we have repeatedly allowed parents to vindicate their due process right to direct the upbringing of their children even when the same conduct supports a child's Fourth Amendment claim. *Id*; *Wernecke*, 591 F.3d at 391 n.7; *Wooley*, 211 F.3d at 923–26.[4]

For almost a decade before Brown took the seven children from their mother, social workers in this circuit have been on notice that they violate procedural due process when they remove children without a court order or exigent circumstances. *Gates*, 537 F.3d at 434. Because the complaint plausibly alleges that is what happened to Plaintiffs' children, this claim against Brown will proceed past the pleading stage.

## III.

What about the other defendants? Plaintiffs do not appeal the district court's ruling that the complaint failed to sufficiently allege a policy or practice that could hold the City of Houston liable for its police officers' involvement in the removal.

Although Plaintiffs do appeal the dismissal of Brown's supervisor (Mouton), reasoning similar to that warranting the city's dismissal also supports her dismissal. A supervisor is liable under section 1983 if: "(1) [s]he affirmatively participates in the acts that cause the constitutional deprivation, or (2) [s]he implements unconstitutional policies that causally result in the

---

[4] *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395 (5th Cir. 2002), is not to the contrary. It was not a child removal case. *Id*. at 412 (distinguishing "the family association cases" in which "the social worker had removed the child from its family home"). Instead, the case involved unlawful entry into the home and a body cavity search of the child, and the parent could have refused consent to both actions. *Id*. at 411-12. Both the parent and child thus had Fourth Amendment claims. *Id*.; *see also Gates*, 537 F.3d at 419 (considering parents' Fourth Amendment claim based on social workers "entry into the home" as the parents had a privacy interest in the home).

constitutional injury." *Gates*, 537 F.3d at 435. The latter policy-focused inquiry is akin to the standard for municipal liability. *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 426 (5th Cir. 2006). That is, for a supervisor to act with "deliberate indifference," she must usually know about a "pattern of similar violations." *Id.* at 427 (quoting *Johnson v. Deep East Texas Regional Narcotics*, 379 F.3d 293, 309 (5th Cir. 2004)). There is no such allegation. Nor are there other allegations sufficient to establish deliberate indifference. As for actual involvement, there are only general allegations that Mouton "approved the unlawful seizure" and worked with Brown "to execute a coordinated removal of the children." Such conclusory allegations are not enough. *Iqbal*, 556 U.S. at 678.

That leaves the allegations against the two police officers who helped Brown remove the three young children from Romero's vehicle. Those allegations do not establish that the officers violated clearly established law. Officers assisting social workers in the removal of children may "reasonably rely on [the child welfare agency's] assessment of the situation." *Gates*, 537 F.3d at 431. There is no general obligation of officers to "cross-examine" other officials they are assisting about the justification for the law enforcement action. *Id.* (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976)).

The officer's reliance on Brown was not clearly unreasonable. Brown had prepared a notice of removal, had visited the home the day before, and there was a pending investigation into domestic violence. There is no indication that the officers had reason to believe that Brown or her agency had "made unconstitutional decisions to remove children in the past." *Id.* These objective bases for relying on Brown about the need to remove the children overcome the conclusory, uncertain, and likely implausible allegation that Brown may have told the officers that there was no emergency to justify the removal. Given all

No. 18-20157

the circumstances, we cannot say that all reasonable officers would have viewed assisting Brown as an unlawful act.  Officers Benavides and Ruiz are entitled to qualified immunity.

* * *

The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART.  The procedural due process claim against Brown is REMANDED for further proceedings in which Brown will be able to tell her side of the story.

No. 18-20157

STEPHEN A. HIGGINSON, Circuit Judge, concurring:

I concur fully in the majority opinion's procedural due process analysis. I write separately only to note that I would not address substantive due process as a distinct cause of action here. *See Morris v. Dearborne*, 181 F.3d 657, 675 (5th Cir. 1999) (Jolly, J., concurring). In similar contexts, the Supreme Court has recognized that the Fourteenth Amendment protects the fundamental liberty interest of parents in the care and custody of their children and then outlined the procedural due process required before depriving parents of that right. *See Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982); *Stanley v. Illinois*, 405 U.S. 645, 650–51 (1972). We followed this approach in *Wooley v. Baton Rouge*, 211 F.3d 913, 923–24 (5th Cir. 2000), and *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 434 (5th Cir. 2008).

In *Wooley*, we explained that "a child's right to family integrity is concomitant to that of a parent" and considered "the nature of the process due [the child] before depriving him of that right." 211 F.3d at 923–24. We held that removing a child from the custody of his mother absent judicial authorization or a threat to the child's safety violated the "clearly established right" of mother and child "to maintain their relationship free from interference by state actors." *Id.* at 924. We further clarified the constitutional standard for child removals in *Gates*, 537 F.3d at 429, 434–35, and *Wernecke v. Garcia*, 591 F.3d 386, 400–01 (5th Cir. 2009). Under *Wooley*, *Gates*, and *Wernecke*, the plaintiffs have alleged a violation of their clearly established Fourteenth Amendment rights.