# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 27, 2025

Lyle W. Cayce
Clerk

_____

No. 24-50571

_____

Megan Marie McMurry, *Individually and as next friend of* J.M.;
Adam Seth McMurry, *Individually and as next friend of* J.M.;
Alesia Jade McMurry,

*Plaintiffs—Appellees*,

*versus*

Alexandra Weaver,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:20-CV-242

_____

Before King, Ho, and Ramirez, *Circuit Judges*.

King, *Circuit Judge*:

Officer Alexandra Weaver took a fourteen-year-old child from her home during a child welfare investigation. The child and her parents sued, claiming Weaver searched the apartment and seized the child in violation of their Fourth and Fourteenth Amendment rights. Weaver now brings an interlocutory appeal of the district court's order denying her motion for summary judgment on the basis of qualified immunity. We AFFIRM.

No. 24-50571

## I.

The following are the facts the district court found sufficiently supported by the summary judgment record.

In October 2018, Plaintiff-Appellee Megan McMurry resided in a gated apartment complex in Midland, Texas with her daughter, Plaintiff-Appellee J.M., (then age fourteen) and son C.M. (then age twelve). J.M. took classes virtually from home, C.M. attended Abell Junior High School (Abell), part of the Midland Independent School District (MISD), and Ms. McMurry taught at Abell. Ms. McMurry's husband and the children's father, Plaintiff-Appellee Seth Adam McMurry, was deployed to the Middle East with the National Guard. To explore a job opportunity that would allow the family to move closer to Mr. McMurry, Ms. McMurry planned a trip to Kuwait from Thursday, October 25 to Tuesday, October 30.

Before leaving, Ms. McMurry arranged for a neighbor, Vanessa Vallejos, to check in on J.M. and C.M., and for coworkers to take C.M. to school. J.M. often babysat Ms. Vallejos's son, and Ms. McMurry had arranged for Ms. Vallejos to watch J.M. and C.M. while she was out of town in the past.

On the morning of October 26, 2018, Defendant-Appellant Alexandra Weaver, a police officer with MISD, received a text from a counselor who was supposed to take C.M. to school that day. Weaver already knew that Ms. McMurry was out of the country because Ms. McMurry had emailed all Abell campus employees including Weaver a few days earlier. Upon receiving the text, she became concerned that J.M. and C.M. were without adult supervision, and informed her supervisor, Officer Kevin Brunner, of her concerns.

Weaver and Brunner then proceeded to meet with three of Ms. McMurry's coworkers and learned that (1) Ms. McMurry was traveling for a

job interview; (2) C.M. was at school; (3) a neighbor, whose son J.M. often babysat, was checking on the children daily; and (4) J.M. was homeschooled. Weaver and Brunner then went to the McMurrys' apartment to conduct a welfare check on J.M.

Weaver and Brunner arrived at the apartment at around 10 a.m. that morning. J.M. answered the door and confirmed that her mother was overseas, and a neighbor was checking on her and C.M. J.M. also told the officers that the neighbor had last checked on her that morning and offered to share the neighbor's phone number for the officers to call. Brunner then instructed J.M. to "go get some warm clothes on . . . then come visit with me outside." Brunner asked if Weaver could accompany her into the apartment while she did so. J.M. responded "Mm-hmm," then burst into tears and said "I'm scared."

Inside the apartment, Weaver told J.M. not to contact her mother. While J.M. changed clothes in her room, Weaver "looked around the living room and kitchen, peeking into the pantry and opening the refrigerator and freezer doors." The pantry was "stocked with food." "Weaver's body camera footage reveals no signs of a dangerous or abusive environment or any other exigent circumstances." Nor does the footage reveal anything "that sounds or looks like" J.M. giving Weaver consent to search the apartment. The interaction lasted about five minutes.

Weaver and Brunner then questioned J.M. in the apartment complex's conference room. "J.M. asked to call her father but was not allowed to do so." After about fifteen minutes, Weaver and Brunner drove to Abell, with J.M. in the backseat of their police car. Brunner instructed J.M. not to respond to her father's attempts to contact her and "recommended" she not contact Ms. Vallejos. Brunner also called CPS to tell them he was taking the children to Abell around this time.

At the school, Brunner placed J.M. in a private office. When Ms. Vallejos and her husband arrived, they told Brunner they were checking on C.M. and J.M. and had last seen the children the night before. Ms. Vallejos was then permitted to see J.M. and the two FaceTimed Mr. McMurry. By that afternoon, CPS had concluded that the situation did not meet the criteria for abuse and neglect and sent the children home with Ms. Vallejos and her husband.

Afterward, Brunner continued criminally investigating Ms. McMurry, and ultimately filed two probable cause affidavits to arrest and charge Ms. McMurry with abandoning or endangering her children. In January 2020, a jury acquitted Ms. McMurry of all charges.

After the acquittal, the McMurrys and J.M. sued Weaver, asserting constitutional claims under § 1983 and state law claims arising from these events. Weaver moved for summary judgment, asserting qualified immunity. The district court concluded Weaver was not entitled to qualified immunity and denied summary judgment on three claims: (1) the McMurrys' Fourth Amendment claim for unreasonable search of the apartment; (2) J.M.'s Fourth Amendment claim for unreasonable seizure, and (3) the McMurrys' Fourteenth Amendment claim for procedural due process. Weaver timely appealed.

## II.

"A district court's denial of a motion for summary judgment on the basis of qualified immunity is immediately appealable under the collateral order doctrine, to the extent that the order turns on a matter of law." *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015). But our jurisdiction is limited. *Kinney v. Weaver*, 367 F.3d 337, 346–47 (5th Cir.2004) (en banc). "[I]n an interlocutory appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence—that is, the question whether there

4

is enough evidence in the record for a jury to conclude that certain facts are true." *Id.* at 347. Instead, "we have jurisdiction only to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts." *Id.* This limitation on our jurisdiction is often described as allowing us to "review the *materiality* of any factual disputes, but not their *genuineness*." *Id.* (quoting *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000)).

Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Given our limited jurisdiction, we do not apply the same Rule 56 standard de novo. *Kinney*, 367 F.3d at 348. Instead, we "consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* "Our review of the legal significance of the facts is de novo." *Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012).

### III.

On appeal, Weaver contends the district court erred in denying qualified immunity at summary judgment on the unreasonable search, unreasonable seizure, and procedural due process claims.[1] "The doctrine of qualified immunity protects public officials from liability for civil damages

---

[1] Plaintiffs-Appellees assert that we lack jurisdiction over this appeal because Weaver's arguments challenge the genuineness of factual disputes. "We do have jurisdiction, but only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record." *Kinney*, 367 F.3d at 347. We lack jurisdiction, and therefore do not address, Weaver's arguments to the extent they challenge the district court's assessment of the sufficiency of the evidence (e.g., whether Weaver or Brunner contacted CPS).

'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jennings v. Patton*, 644 F.3d 297, 300 (5th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "This analysis involves two steps: (1) we must determine whether the plaintiffs suffered a violation of their rights as a matter of law, and then (2) we must decide whether the right at issue was clearly established at the time of the alleged misconduct." *Banks v. Herbrich*, 90 F.4th 407, 412 (5th Cir. 2024). Courts "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023) (quoting *Pearson*, 555 U.S. at 236). Where, as here, a defendant asserts the defense of qualified immunity, "the burden shifts to the plaintiff to show that the defense is not available." *Trent*, 776 F.3d at 376.

## A.

Weaver first challenges the district court's denial of qualified immunity on the Fourth Amendment unreasonable search claim. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). "[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* The well-recognized exception for exigent circumstances "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely*, 569 U.S. 141, 148–149 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). In the context of child welfare investigations, this court has explained that "the typical Fourth Amendment standards of a court order, consent, or exigent circumstances apply." *Gates v. Texas Dept. of Protective and Reg. Services*, 537 F.3d 404, 424

No. 24-50571

(5th Cir. 2008). Exigent circumstances exist when a child faces "immediate danger." *Id.* at 423.

Here, the parties do not dispute that Weaver searched the refrigerator without a court order or consent.[2] To comply with the Fourth Amendment, the search must be justified by exigent circumstances. *Gates*, 537 F.3d at 422–24. But Weaver does not argue that there were exigent circumstances, and the district court found that there were none. Instead, Weaver relies on a "special needs" or "community caretaking" exception to the warrant requirement. Neither applies here.

A warrant may not be required where there is a "special need" that is "divorced from the State's general interest in law enforcement," such as a principal's search of a student's purse for drugs in school. *Roe v. Texas Dept. of Protective and Reg. Services*, 299 F.3d 395, 404 (5th Cir. 2002) (quoting *Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001)). Similarly, different standards may apply when the police perform "community caretaking functions" that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Bakutis v. Dean*, 129 F.4th 299, 303 (5th Cir. 2025) (quoting *United States v. York*, 895 F.2d 1026, 1030 (5th Cir. 1990)). Child welfare investigations are not sufficiently divorced from general law enforcement, or the violation of a criminal statute, to support the application of either exception. *See Gates*, 537 F.3d at 424 (holding that because a home visit "to investigate possible child abuse was not separate from general law enforcement, the special needs doctrine cannot be used to justify the warrantless entry"); *Roe*, 299 F.3d at 406–07 (explaining that "the goal of protecting a child's welfare" is not

---

[2] The district court found that J.M. consented to Weaver entering the apartment and dismissed the unreasonable search claim to the extent it relied on Weaver's entry. That ruling is not challenged on appeal.

easily disentangled "from general law enforcement purposes"). That is particularly evident here, where criminal charges were ultimately brought against Ms. McMurry.

To the extent Weaver intended to argue the search was justified by exigent circumstances, the summary judgment evidence does not establish that J.M. faced any "immediate danger." *Gates*, 537 F.3d at 422–23 (finding no exigent circumstances to justify entry into a home where the stated purpose was to "interview the children" rather than "guard them against some sort of immediate danger" and the alleged abuser was not home). Moreover, it is difficult to see how viewing a refrigerator's contents could guard against any immediate danger, especially given Weaver could see food in the pantry. *See Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (explaining "a warrantless search must be strictly circumscribed by the exigencies which justify its initiation" (internal quotations omitted)).

Because a jury could find that the warrantless search here was not justified by exigent circumstances, and no other exception justifies the search, the McMurrys have asserted a constitutional violation of their Fourth Amendment right to be free from unreasonable searches. To survive summary judgment, the McMurrys must also show that the constitutional violation was clearly established as of October 2018.

By 2018, *Gates* had held that government officials conducting home visits "to investigate possible child abuse" must satisfy "the typical Fourth Amendment standards of a court order, consent, or exigent circumstances." *Gates*, 537 F.3d at 424. *Gates* had defined exigent circumstances in this context as "immediate danger" to the children. *Id.* at 422–23. And *Wernecke* applied *Gates*' standard to the child endangerment, rather than child abuse, context. *Wernecke v. Garcia*, 591 F.3d 386, 397 (5th Cir. 2009). This is sufficient to put Weaver on notice that she would be committing a

constitutional violation if she opened the refrigerator without a court order, consent, or a reasonable belief of immediate danger to the children. *See Delaughter v. Woodall,* 909 F.3d 130, 140 (5th Cir. 2018) (explaining the "central concern is whether the official has fair warning").

Contrary to Weaver's arguments, the community caretaking exception does not undermine the clarity of this established law. By holding that the typical Fourth Amendment standards apply in this context, *Gates* foreclosed the possibility of a lower standard justified by community caretaking. 537 F.3d at 424. Moreover, the rationale behind *Gates*' explicit rejection of the special needs exception applies with equal force to community caretaking: The home entry "was not divorced from the state's general interest in law enforcement." *Id.* Based on the facts supported by the summary judgment record, the McMurrys have established that Weaver's search was a constitutional violation of clearly established law that defeats qualified immunity.

## B.

Weaver next challenges the district court's denial of qualified immunity on J.M.'s Fourth Amendment unreasonable seizure claim. "[T]he Fourth Amendment . . . applies to the seizure of children from their homes." *Gates*, 537 F.3d at 427. The same standard governs: "[T]he government may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Id.* at 429. "Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger . . . if [s]he remains in h[er] home." *Gates*, 537 F.3d at 429.

J.M. was seized from her home without a court order or parental consent. *See McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, at *2 (5th Cir. Dec. 7, 2022) (explaining "a reasonable fourteen-year-old would not

have believed she was free to leave"). Like the search, the seizure requires exigent circumstances to comply with the Fourth Amendment. Again, Weaver does not argue there were exigent circumstances, and a jury could find that Weaver did not have reasonable cause to believe that fourteen-year-old J.M. faced any "immediate danger" at home alone in a gated apartment complex in the middle of the day.[3]

Furthermore, at the time of the alleged violation, *Gates* and *Wernecke* "had clearly established that an officer could not reasonably remove a child from their home absent a court order, parental consent, or exigent circumstances." *Brunner*, 2022 WL 17493708, at *2 (citing *Gates*, 537 F.3d at 427–29; *Wernecke*, 591 F.3d at 398). Weaver's arguments to the contrary are unavailing. Her reliance on the community caretaking exception fares no better here. And it is not reasonable to believe that J.M. transformed her family's apartment into the constitutional equivalent of a public school merely by attending virtual classes from home. *See Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). Because the summary judgment evidence supports a violation of J.M.'s clearly established Fourth Amendment right to be free from unreasonable seizure, Weaver is not entitled to qualified immunity.

## C.

Finally, Weaver challenges the district court's denial of qualified immunity on the McMurrys' procedural due process claim. The Due Process Clause of the Fourteenth Amendment "does not just provide parents with

---

[3] Weaver does argue that she was merely following Brunner's lead, but the district court found the evidence sufficient to show the officers acted collaboratively. We lack jurisdiction to review that finding. *Kinney*, 367 F.3d at 346–47.

substantive protection from interference with their liberty interest in the care, custody, and management of their children." *Romero v. Brown*, 937 F.3d 514, 521 (5th Cir. 2019). "It also requires that the state follow certain procedures before encroaching on those parental rights." *Id.* A parent's procedural due process claim premised on the seizure of her child is governed by the same standard that governs the child's underlying Fourth Amendment claim for unreasonable seizure. *Id.* at 521. "The rule is this: A child cannot be removed 'without a court order or exigent circumstances.'" *Id.* (quoting *Gates*, 537 F.3d at 434).

Here, the McMurrys' Fourteenth Amendment claim for procedural due process is premised on J.M.'s Fourth Amendment claim for unreasonable seizure. Accordingly, the McMurrys have established a constitutional violation sufficient to survive summary judgment for the same reasons: J.M. was seized without a court order or exigent circumstances. And that violation was equally clearly established by *Gates* and *Wernecke*. *Romero*, 937 F.3d at 522–23 (denying qualified immunity on procedural due process claim in part because *Gates* and *Wernecke* clearly established the violation); *Gates*, 537 F.3d at 435; *Wernecke*, 591 F.3d at 391 n.7. The district court did not err in denying qualified immunity on the McMurrys' procedural due process claim.

## IV.

Finding no reversible error in the district court's proceedings, we AFFIRM.

No. 24-50571

JAMES C. HO, *Circuit Judge*, concurring:

It seems obvious that parents don't forfeit their constitutional rights just because they choose to educate their children at home, rather than at a public school. Yet that's exactly what defense counsel contends here.

Counsel theorizes that parents who choose to homeschool convert their private homes into public schools for Fourth Amendment purposes. As a result, police officers can take children away from their home, and prevent their parents from communicating with them, if they're homeschooled.

This is obviously wrong as a matter of law—and offensive to parental rights. Yet counsel claims that, because "there's no case law" specifically rejecting this defense theory, families who homeschool can't claim any "clearly established" rights, so qualified immunity must be granted.

It's an argument that warrants swift repudiation. And that's precisely what our court does today. *See ante*, at 11. I concur but write separately because I'm troubled that counsel felt comfortable attempting the argument.

I'm especially troubled because it's not counsel's fault—it's our own fault. It's our own decisions that invite arguments like this—in conflict with Supreme Court precedent, separate opinions by Justices Thomas and Gorsuch, and the precedents of every other court of appeals in the country.

## I.

During oral argument, defense counsel put forth a remarkable legal theory that should alarm anyone who believes in the privacy of the home—as well as the basic right of every parent to raise their own children:

> There's . . . another area where the law isn't clearly established. And that is: Was she taken from an apartment or was she taken from her school?

> The reason I say that is because she was attending virtual school at the time . . . she was in class, so to speak, doing her work on her computer.
>
> There's no case law whatsoever that establishes that an apartment stays an apartment when you're going to school. We have a whole new area of law that's going to emerge because we have homeschooling. . . . We don't have any cases whatsoever. . . .
>
> There was no clearly established law to violate. . . . Because it's not clear that a home is a home . . . when it's being used at the time for virtual school.

Oral Arg. at 9:10–10:27.

This is obviously wrong as a matter of rudimentary constitutional principle. The Fourth Amendment expressly assures every one of us—including families who homeschool—that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. It seems obvious that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Ct. for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972). *See also Payton v. New York*, 445 U.S. 573, 585 (1980) (same).

To justify intrusions on this bedrock liberty based on the educational choices parents make for their children does not evade the constitutional objection—it exacerbates it. *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972) ("the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society," and implicates "fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children"); *id.* at 232 ("The history and culture

13

of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children," and the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op. of O'Connor, J.) ("the interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized"); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256 (2022) (noting "the right to make decisions about the education of one's children") (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), and *Meyer v. Nebraska*, 262 U.S. 390 (1923)); Michael E. Lechliter, *The Free Exercise of Religion and Public Schools: The Implications of Hybrid Rights on the Religious Upbringing of Children*, 103 Mich. L. Rev. 2209, 2215 (2005) ("parents have a fundamental right under the U.S. Constitution to direct the religious upbringing of their children"); Darryn Cathryn Beckstrom, *Balancing Civic Values and Parents' Free Exercise Rights*, 45 Gonz. L. Rev. 149, 165 (2010) ("[P]arents have rights under the First Amendment's Free Exercise Clause . . . to protect their ability to control the upbringing of their children.").

## II.

So I'm grateful that the majority denies qualified immunity—and does so by summarily dismissing counsel's defense theory. After all, it's precisely because counsel's theory is so obviously wrong that the McMurrys shouldn't have to identify specific governing precedent to avoid qualified immunity.

The Supreme Court has repeatedly denied qualified immunity where it found the constitutional violation so "obvious" that it didn't require the plaintiff to identify factually indistinguishable case law. *See*, *e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("general statements of the law . . . may apply with obvious clarity to the specific conduct in question, even though

the very action in question has not previously been held unlawful") (cleaned up) (quoting *United States v. Lanier*, 520 U.S. 259, 270–71 (1997), and *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Taylor v. Riojas*, 592 U.S. 7, 8–9 & n.2 (2020) (summarily reversing our court's grant of qualified immunity due to the "obviousness" of the constitutional violation) (citing *Hope* and *Lanier*).

The "obviousness" principle recognized in cases like *Hope* and *Taylor* should be intuitive to all who cherish our constitutional liberties. Then-Judge Gorsuch captured it well: "[S]ome things are so obviously unlawful that they don't require detailed explanation." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015). "[S]ometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing." *Id.* "[I]t would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." *Id.* at 1082–83.

And that's precisely the point. It seems absurd to suggest that the most egregious constitutional violations imaginable are somehow immune from liability precisely because they're so egregious. It would make a mockery of our rights to grant qualified immunity just because no one in government has yet to be abusive enough to commit that particular violation—and then stubborn enough to litigate it, not only before a district court, but also in the court of appeals (or the Supreme Court).

## III.

But although it should be easy to dismiss counsel's plainly erroneous defense, it's profoundly disquieting that the defense finds so much support in our court's precedents. An enduring en banc majority has repeatedly held that *Hope* and *Taylor* apply only to the Eighth Amendment—and not, for example, to obvious violations of the First Amendment.

In *Villarreal v. City of Laredo*, 94 F.4th 374 (5th Cir. 2024), the en banc majority admitted that *Hope* and *Taylor* denied qualified immunity based on "obvious" and "particularly egregious" constitutional violations—and did so without requiring a "fact-specific[]" presentation of case law. *Id.* at 395.

But the majority waved away those decisions on the ground that they're "Eighth Amendment cases"—and that they establish only a "narrow[] obviousness exception" that should not apply to obvious violations of the First Amendment. *Id.*

Why the en banc majority chose to disfavor the First Amendment in contrast to the Eighth Amendment—or law-abiding citizens in favor of incarcerated criminals—it did not explain. It simply claimed support in our earlier en banc decision in *Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011). *Id. Contra Morgan*, 659 F.3d at 412, 414 n.30 (Elrod, J., dissenting in part) (concluding that *Hope* applies to obvious First Amendment violations).

Fortunately, the Supreme Court subsequently vacated our en banc decision in *Villarreal*. *See Villarreal v. Alaniz*, 145 S. Ct. 368 (2024).

But our en banc majority has now responded by reinstating its previous statements on *Hope* and *Taylor*. *See Villarreal v. City of Laredo*, 134 F.4th 273, 276 (5th Cir. 2025) ("[o]ur previous en banc majority opinion is superseded only to th[e] extent" necessary to respond to the Supreme Court's vacatur regarding the substantive requirements of a First Amendment retaliation claim). So I must confront *Morgan* and *Villarreal*.

## A.

Our decisions in *Morgan* and *Villarreal* have been widely disparaged as troubling rulings that badly undermine First Amendment rights, and thus warrant swift reversal by the Supreme Court—consistent with the Court's summary reversal of our circuit in *Taylor*.

*Morgan* has been sharply criticized by religious liberty experts as a terrible "mistake" that makes it "so difficult to establish fair warning for unconstitutional actions that qualified immunity will cease to be 'qualified.'"[4]

*Villarreal* further compounds the error we made in *Morgan*. A broad coalition of leading civil rights and religious liberty organizations—including but not limited to Alliance Defending Freedom, Constitutional Accountability Center, First Liberty Institute, and Project for Privacy and Surveillance Accountability—have called our en banc decision in *Villarreal* "insidious" and "dangerous." *See*, *e.g.*, Brief of First Liberty Institute as Amicus Curiae in Support of Petitioner, *Villarreal v. Alaniz*, No. 23-1155 (U.S.), 2024 WL 2058693, at *10–11 ("The approach taken by the Fifth Circuit towards qualified immunity is exactly the kind of approach this Court castigated in *Hope* and its progeny" and "has an insidious quality."); Brief of Young America's Foundation and Manhattan Institute as Amici Curiae in Support of Petitioner, *Villarreal v. Alaniz*, No. 23-1155 (U.S.), 2024 WL 2786483, at *12 ("Left undisturbed, the Fifth Circuit's ruling provides dangerous license for government actors to flagrantly violate the Constitution without recourse, even against the most established rights, simply because they invoke a novel factual situation never before specifically addressed by the courts."); Brief of Project for Privacy and Surveillance Accountability as Amicus Curiae in Support of Petitioner, *Villarreal v. Alaniz*, No. 23-1155 (U.S.), 2024 WL 2786482, at *1–2 (en banc decision "will have serious adverse consequences throughout the Fifth Circuit and in

---

[4] *See* Hiram Sasser, *Fifth Circuit Gets It Right in* Arnold *Decision,* Federalist Soc'y (Dec. 20, 2021), https://fedsoc.org/commentary/fedsoc-blog/fifth-circuit-gets-it-right-in-arnold-decision; Ilya Shapiro, *Morgan v. Swanson*, Cato Institute (Jan. 26, 2012), https://www.cato.org/legal-briefs/morgan-v-swanson-0.

any other jurisdictions that follow that Circuit's analysis"); Brief for Amicus Curiae Americans for Prosperity Foundation in Support of Petitioner, *Villarreal v. Alaniz*, No. 23-1155 (U.S.), 2024 WL 2058690; Brief of Amicus Curiae Center for American Liberty in Support of the Petitioner, *Villarreal v. Alaniz*, No. 23-1155 (U.S.), 2024 WL 2786477; Brief of the Institute for Justice as Amicus Curiae Supporting Petitioner, *Villarreal v. Alaniz*, No. 23-1155 (U.S.), 2024 WL 2786491; Brief of Constitutional Accountability Center as Amicus Curiae in Support of Petitioner, *Villarreal v. Alaniz*, No. 23-1155 (U.S.), 2024 WL 2786494.

**B.**

This chorus of criticism of *Morgan* and *Villarreal* is sadly warranted.

"Nothing in § 1983 suggests that courts should favor the Eighth Amendment rights of convicted criminals over the First Amendment rights of law-abiding citizens." *Villarreal*, 94 F.4th at 413 (Ho, J., dissenting). Yet that's precisely what *Morgan* and *Villarreal* require. They make the qualified immunity analysis in *Hope* and *Taylor* available to incarcerated prisoners—and no one else. They apply those principles to the Eighth Amendment, but for some unexplained reason, not the First. In sum, they "treat the First Amendment as a second-class right." *Id.*

Not surprisingly, that plainly misreads Supreme Court precedent. Nothing in *Hope* and *Taylor* indicate that its qualified immunity analysis turns on which provision of the Constitution is at issue. *See also*, *e.g.*, *id.* at 414 (discussing *Sause v. Bauer*, 585 U.S. 957 (2018)). Nor does the wisdom expressed by then-Judge Gorsuch in *Browder*—a case that does not involve the Eighth Amendment at all. 787 F.3d 1076.

So it's not surprising that every other circuit in America rejects our court's counterintuitive vision of qualified immunity. Every other federal court of appeals across the country has held that "the standards articulated

in *Hope* apply specifically in the First Amendment" or in other constitutional contexts. *Villarreal*, 94 F.4th at 413 (Ho, J., dissenting). *See id.* at 413–14 (collecting First Amendment cases from the First, Second, Third, Fourth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits, and non-First Amendment cases from the Eighth and D.C. Circuits). *See also Morgan*, 659 F.3d at 412, 414 n.30 (Elrod, J., dissenting in part)).

## C.

There's another reason why *Morgan* and *Villarreal* should be rejected, as noted by Justice Thomas in *Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021).

It's one thing to grant qualified immunity when it comes to police officers who are forced to make split-second judgment calls in life-and-death situations. It's quite another thing to immunize public officials who make a deliberate and calculated decision to violate one's constitutional rights. As Justice Thomas put it, "why should [public officials] who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?" *Id.* at 2422 (Thomas, J., respecting denial of certiorari).

I've long agreed with that vision of qualified immunity, beginning with my partial dissent in *Horvath v. City of Leander*, 946 F.3d 787, 801–3 (5th Cir. 2020) (distinguishing between "police officers who put their lives on the line" and public officials who make a considered decision to infringe on religious liberties). "When public officials are forced to make split-second, life-and-death decisions in a good-faith effort to save innocent lives, they deserve some measure of deference." *Wearry v. Foster*, 52 F.4th 258, 259 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc). But "when public officials make the deliberate and considered decision to trample on a citizen's constitutional rights, they deserve to be held

accountable." *Id.  See also*, *e.g.*, *Villarreal v. City of Laredo*, 17 F.4th 532, 540–41 (5th Cir. 2021) ("There is a big difference between split-second decisions by police officers and premeditated plans to arrest a person for her journalism.") (quotations omitted), *superseded by* 44 F.4th 363, 371 (5th Cir. 2022) (same), *vacated on reh'g en banc*, 52 F.4th 265 (5th Cir. 2022); *Oliver v. Arnold*, 19 F.4th 843, 852 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc) ("[I]magine we denied qualified immunity to a police officer for making a split-second, life-or-death decision to protect innocent citizens against violent criminals—but granted qualified immunity to a public school teacher who deliberately punished a student for exercising her freedom of conscience on one of the most sensitive issues dividing our Nation.  To my mind, that would turn the law upside down."); *Gonzalez v. Trevino*, 60 F.4th 906, 912 (5th Cir. 2023) (Ho, J., dissenting from denial of rehearing en banc) ("We're . . . getting qualified immunity backwards" if "[o]fficers who deliberately target citizens who hold disfavored political views face no accountability—but officers who make split-second, life-and-death decisions to stop violent criminals must put their careers on the line for their heroism.").

So I'm grateful that six members of our court embraced these principles in three different en banc dissents in *Villarreal*.  *See* 94 F.4th at 399 (Graves, J., dissenting); *id.* at 406–7 (Willett, J., dissenting); *id.* at 410 (Ho, J., dissenting).  And I'm regretful that the majority rejected these views, and instead granted qualified immunity, both before and after the Supreme Court vacated our first en banc decision in *Villarreal*.

## IV.

But just because counsel's argument finds support in *Morgan* and *Villarreal* doesn't mean I have to go along with it.

As a member of this panel, I'm of course duty bound to follow en banc precedent—whether I agree with it or not.  But I'm not obliged to extend it. *See*, *e.g.*, *Neese v. Becerra*, 127 F.4th 601, 603 (5th Cir. 2025) (Ho, J., dissenting from denial of rehearing en banc) ("[W]e are duty-bound to faithfully apply [binding precedent] as an inferior court, regardless of one's views on the matter.  But we are not required to extend it.") (citation omitted).

So I won't.  It's unfortunate that *Morgan* and *Villarreal* decline to protect citizens from obvious violations of the First Amendment.  It's unsurprising that *Morgan* and *Villarreal* have been sharply criticized by a diverse range of leading legal voices as a result.  I will not make things worse by extending this mistaken body of precedent and refusing to protect citizens from obvious violations of the Fourth Amendment as well as the First.

* * *

I agree with the denial of summary judgment based on qualified immunity, and accordingly concur.